EXHIBIT A

**THE ALTMAN LAW GROUP**
BRYAN C. ALTMAN (State Bar No. 122976)
JOEL E. ELKINS (State Bar No. 256020)
6300 Wilshire Blvd. Suite 980
Los Angeles, California 90048
Telephone: (323) 653-5581
Fax: (323) 653-5542

Attorneys for Plaintiff ORIT ARFA

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

ORIT ARFA, an individual,

        Plaintiff,

        vs.

ZIONIST ORGANIZATION OF AMERICA, a New York corporation; MORTON KLEIN, an individual; and DOES 1 through 20, inclusive,

        Defendants.

CASE NO.    BC 503 86 2

**COMPLAINT FOR:**

- **WRONGFUL TERMINATION**
- **CIVIL CONSPIRACY**
- **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
- **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
- **UNFAIR BUSINESS PRACTICE**

**DEMAND FOR JURY TRIAL**

    COMES NOW Plaintiff ORIT ARFA ("ARFA" or "Plaintiff"), and alleges causes of action against Defendants and DOES 1-20, and each of them, as follows:

## JURISDICTION AND VENUE

    1.    This action arises out of Plaintiff ARFA's employment by Defendants as the Executive Director of the Western Region of the ZIONIST ORGANIZATION OF AMERICA, located at the time at 6505 Wilshire Boulevard, Los Angeles, California. She was hired and eventually fired within this judicial district.

-1-

**COMPLAINT**

2.      This Court has jurisdiction over this unlimited action because the damages alleged by Plaintiff exceeds $25,000, the jurisdictional limits of this Court.

3.      Venue is proper in this District because the complained of actions occurred in this judicial district, and, during the relevant times herein, primary Defendant ZIONIST ORGANIZATION OF AMERICA maintained an office in this district.

## THE PARTIES

4.      Plaintiff ORIT ARFA is, and at all times mentioned herein has been, an individual residing in Los Angeles, California.

5.      Plaintiff is informed and believes, and based thereon alleges, that Defendant ZIONIST ORGANIZATION OF AMERICA ("ZOA"), is, and at all times relevant herein was, a not-for-profit New York corporation, except that effective May 2011, the ZOA's federal tax exempt status was revoked by the Internal Revenue Service.  The ZOA is headquartered at 4 East 34th Street, New York, New York, and, during the relevant times herein, maintained the office of its Western Region at 6505 Wilshire Boulevard, Los Angeles, California.

6.      Plaintiff is informed and believes, and based thereon alleges, that Defendant MORTON KLEIN ("KLEIN") is, and at all times relevant herein has been, an individual residing in Pennsylvania, and the National President of the ZOA.  KLEIN regularly travels to and conducts business in Los Angeles in the course of his duties as National President.

7.      Plaintiff is informed and believes and based thereon alleges that Defendants, DOES 1 to 20, and each of them, were business entities, organizations, and/or individuals who participated in the acts alleged in more particular detail hereinafter.

8.    Defendants named herein as DOES 1-20, inclusive, are named pursuant to California *Code of Civil Procedure* § 474. The names and capacities of the DOES 1-20, and each of them, are unknown to Plaintiff who is ignorant of their true identities. Additionally, the specific acts giving rise to the causes of action alleged against said DOE defendants are unknown to Plaintiff, who therefore sues them by such fictitious names. This Complaint will be amended to show the true names and capacities of the DOE defendants, and each of them, when ascertained.

9.    Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, the Defendants and DOES 1-20, and each of them, were the agents, servants employees, subsidiaries, and representatives of each remaining Defendant, and in doing the things alleged in this Complaint were acting within the course, scope, purpose and authority of that agency, representation and employment. Therefore, Plaintiff invokes the doctrines of agency liability, *respondeat superior* and vicarious liability. Plaintiff alleges on information and belief that the Defendants acted together in concert to cause damages to Plaintiff, and each committed all or part of the below-described acts which caused harm to Plaintiff and each aided and abetted other Defendants in the commission of those acts.

## FACTUAL BACKGROUND

10.    On or about September 15, 2011, Plaintiff ARFA accepted an offer of employment from Defendant ZOA to serve as ZOA's Western Region Executive Director, and began her position on or about October 24, 2011.

11.    ARFA served in this position for approximately one year, performing her responsibilities admirably and garnering praise for her dedication, passion, energy, professionalism, organizational skills and results from ZOA leadership, major donors and members of the community with whom she worked.

-3-

12. On our about February 22, 2012, ZOA was informed by the IRS that its not-for-profit (and, by extension, its tax exempt) status had been revoked, retroactive to May 2011, for failure to file the necessary Form 990s for three consecutive years. Plaintiff alleges on information and belief that one of the reasons the ZOA failed to file these forms was that KLEIN did not want to disclose the compensation he was receiving during those years as the ZOA's President (an average of over $1 million per year for those years including base salary, deferred compensation and other benefits). This compensation was grossly unreasonable compared to the compensation received by national presidents of comparable non-profit organizations.

13. KLEIN informed select members of ZOA's Board of Directors of the loss of ZOA tax-exempt status by telephonic conference call and retained tax counsel for ZOA. ARFA (along with the other Regional Directors) were not informed of this development until mid-March 2012.

14. On or about March 28, 2012, ZOA's National Executive Director David Drimer sent an email to ARFA and other Regional Directors regarding the loss of ZOA's tax exempt status. In the email, he instructed the recipients not to "broach this subject with donors unless it is absolutely necessary or they ask about it specifically." He also included a list of "talking points" on the issue and an alternative means by which tax-deductible donations can still be made to ZOA, through the Foundation for the Jewish Community (FJC), a non-profit holding organization which would preserve all donations earmarked for ZOA until such time, if any, that the ZOA regains its tax exempt status. (A copy of the email with attachments is attached hereto as Exhibit A and incorporated herein by reference.)

15. Defendants' scheme to disguise the loss of ZOA's tax-exempt status included setting up a fund ("ZOA Donors Fund") through a non-profit called the Foundation for the

-4-

**COMPLAINT**

1   Jewish Community (FJC) into which donors could make tax-deductible donations

2   earmarked for the ZOA.  The FJC would hold these funds aside until such time, if any, that

3   the ZOA regains its non-profit status.  The FJC would charge a 2% automatic deduction on

4   each donation, plus an additional 1% annual fee as long as it held the funds.  Potential

5   donors were not told of the details of this arrangement, including that the FJC was an

6   entirely different organization not affiliated with the ZOA and that donations made to the

7   FJC might never be made available to the ZOA, but ARFA and other ZOA directors were

8   told to instruct donors to make all their contribution checks to the ZOA thorugh the FJC, for

9   example by writing "FJC -- ZOA Donors Fund" as payee.  Also, the ZOA website's "Donate

10  to ZOA" button rerouted donors to a Paypal page for "FJC - A Foundation of Philanthropic

11  Fund, Reference: ZOA Donor Fund."

12

13       16.     Regional directors were not instructed to remove the tax exempt or 501(c)(3)

14  designation on their region's website at that time, and, in fact, many regional websites

15  continued to misrepresent that the ZOA was a tax-exempt 501(c)(3) charity for months after

16  that.

17

18       17.     Following the Drimer email, ARFA complied with ZOA's talking points in

19  connection with her fund-raising efforts, despite her feeling of unease about the ethics of

20  doing so.  However, she informed ZOA's management that she felt uncomfortable not being

21  up front with potential donors.

22

23       18.     In response, KLEIN began calling her on her cell phone at all hours of the day

24  and night to berate her, increasing pressure on her to fund-raise.  Plaintiff is informed and

25  believes that she was being inordinately pressured to raise funds in part to compensate for

26  the decline in fundraising from KLEIN himself and in part to retaliate against her insistence

27  on disclosing the loss of tax exempt status.  Since the disclosure of the loss of ZOA's tax

28  exempt status in mid-March, the budgets allocated to the regions from the national

-5-

**COMPLAINT**

1    organization were cut, due to the decrease in contributions.  This led to the forced

2    cancellation of some events and programs.  Despite the additional budgetary restrictions,

3    KLEIN continued to receive his full salary and benefits, which totaled over one million

4    dollars annually, much larger than that earned by presidents of comparable organizations.

5    The public and potential donors were not aware of KLEIN's grossly excessively salary

6    because the ZOA failed to file the necessary information returns with the Internal Revenue

7    Service for several years.  Such filings would have disclosed the full extent of his

8    compensation.

9

10        19.    KLEIN's telephone calls became increasing abusive, to the point that ARFA

11   became anxious every time her cell phone would ring.  At about this time, ARFA began to

12   address with a therapist her anxiety from KLEIN's continual harassment.

13

14        20.    KLEIN also informed ARFA that she was no longer to report to her previous

15   immediate supervisor, Steve Goldberg, the National Vice Chairman of the ZOA and

16   Chairman of the Los Angeles Chapter, but instead to KLEIN himself.  Furthermore, KLEIN

17   told ARFA that she must have all communications with the public, including publications,

18   press releases and emails, pre-approved by KLEIN.

19

20        21.    On or about July 30, 2012, Seton & Associates, an outside law firm retained

21   by Goldberg to research the matter, issued a memorandum ("Seton Memorandum" attached

22   hereto as Exhibit B) opining that ZOA's tax-exempt status was clearly material to any

23   potential donor, and that the efforts of ZOA, in general, and KLEIN, in particular, to conceal

24   its loss was "inexcusable," potentially exposing ZOA to claims for breach of fiduciary duty

25   and fraud by donors.  It further found that KLEIN had fostered an organizational climate

26   that discourages discussion and dissent, and that he and the Board had failed to exercise

27   proper oversight, comparing this case to that of Penn State and Jerry Sandusky.

28

22.   The Seton Memorandum was subsequently distributed to the entirety of ZOA's Board of Directors, at which point many board members first discovered of the loss of ZOA's tax exempt status.  At least one board member resigned from the board upon hearing the news and finding out that KLEIN had known about the loss, but had failed to inform the entire board, for months.

23.   At about that time, KLEIN was hospitalized for heart surgery and ARFA was told that, in his absence, she was to report directly to, and have all communications pre-approved by, Drimer and Chairman of the Board Michael Goldblatt.

24.   When KLEIN recovered from his heart surgery in early September, he resumed his harassing calls to ARFA, berating her for making waves and admonishing her to increase her fund-raising.  He even threatened to fire her and close the Los Angeles office if she continued to raise the tax-exempt issue.  Despite the legal opinions expressed in the Seton Memorandum, both KLEIN and Drimer continued to demand that ARFA and other regional directors not disclose to potential donors the loss of its tax-exempt status unless asked directly by the donor.

25.   On or about September 5, 2012, ARFA wrote a memorandum to Drimer, Goldblatt and Goldberg conveying her feeling that she was being put in the middle of a fight among the Board regarding the tax issue and that she was being forced to do something that was both unethical and illegal.  In the memo, she said that she "cannot in good conscience be asked to hide information that [she feels] affects the ethical and also legal operations of the ZOA."  (See Exhibit C hereto.)

26.   In response, KLEIN continued to make  harassing calls to ARFA threatening to fire her unless she complied with his order to raise money without disclosing voluntarily to donors that the ZOA had lost its tax exempt status.

27.     When ARFA complained to Drimer about the harassing telephone calls from KLEIN, Drimer informed KLEIN, and KLEIN berated her for disclosing the contents of their telephone calls and for not keeping them confidential.

28.     ARFA continued to express her concerns to her superiors and convey her discomfort at being put in this ethical dilemma and to again plead her position that ZOA should exercise full and immediate disclosure to donors and the public at large.  On or about September 28, 2012, ARFA wrote another memo to Drimer, Goldblatt and Susan Tuchman, a ZOA employee, and the lawyer in charge of ZOA's Center for Law & Justice, expressing the stress that the issue was causing her and complaining of KLEIN's harassments and attempts at intimidation.  (See Exhibit D hereto.)

29.     Immediately after receiving this second memo, Drimer called ARFA and asked to see a copy of the building lease for the Western Region office.  ARFA did not know at the time but has later discovered that he did so in retaliation for this memo so that he could arrange to get out of the lease and close down the Los Angeles office of the Western Region.

30.     ARFA continued to pursue new avenues for fund-raising, including a solicitation email to the region's past donors.  In the email, she wanted to reference the tax issue and direct questions to herself or Drimer, but KLEIN ordered her to remove the reference from the email.

31.     Concerned that KLEIN was ordering her to act illegally, ARFA sought informal advice from a tax law expert, who confirmed her concerns that the practice is, at best, unethical and, at worst, illegal.  On October 12, 2012, ARFA wrote a third memo to KLEIN, Drimer, Goldblatt, Goldberg and Tuchman, in which she noted that the practice was certainly unethical and disingenuous and expressed doubt about the legality of KLEIN's

-8-

1   order.   (See Exhibit E hereto.)

2

3        32.      Following the October 12, 2012 memo, Drimer assured ARFA that her job

4   was not in jeopardy and that renegotiation of the terms of the office lease was simply

5   "procedure."   In November Drimer informed ARFA that he would be coming into town for

6   a friend's birthday party and would like to meet with her at the Los Angeles Regional office

7   to discuss certain matters, including extending the office lease.

8

9        33.      On November 19, 2012, approximately one month after her last memo, ARFA

10  met with Drimer and was surprised to find out that he had also brought Tuchman.  ARFA

11  immediately realized that Drimer's birthday party story was a fabrication, and that they had

12  both flown to Los Angeles for the express purpose of firing her upon instruction and at the

13  direction of KLEIN.

14

15       34.      Drimer informed her that she was being fired, effective immediately.  As

16  justification for the firing, Tuchman expressed consternation that ARFA had contacted

17  outside legal advice on the tax issue instead of simply following KLEIN's order.  When

18  ARFA explained that she still had concerns about the legality of concealing the tax issue

19  from donors, Drimer and Tuchman told her that if that was the case, she should have simply

20  left the organization.

21

22       35.      ARFA asked to speak with Goldberg, but was pressured not to do so, on the

23  pretense that it would present a "conflict of interest."  ARFA was also not allowed to

24  contact Paul Schnee, the local President.  Eventually, she was allowed to bring her mother

25  into the meeting for emotional support.  ARFA was offered severance pay if she agreed to

26  sign a release of the ZOA on the spot.  ARFA refused and was given fifteen minutes to

27  clean out her desk and leave the office.

28

-9-

**COMPLAINT**

36.     Later, KLEIN and Drimer claimed that ARFA's termination had nothing to do with her work performance, her opposition to concealing the loss of ZOA's tax-exempt status or anything personal.  They claimed that it was merely a consequence of a business decision to close the Los Angeles office and relocate the office of the Western Region to Oakland.  The decisions to fire ARFA and to relocate the Western Regional office were neither approved by nor discussed with the ZOA Board of Directors.  ARFA was never offered the opportunity to relocate and continue her position in Oakland.

## FIRST CAUSE OF ACTION

## WRONGFUL TERMINATION - VIOLATION OF PUBLIC POLICY

### (Against All Defendants)

37.     Plaintiff hereby incorporates by reference all foregoing paragraphs of this Complaint, as though fully set forth herein.

38.     Plaintiff was terminated in retaliation for her opposition to illegal conduct, namely, the concealing of the loss of Defendant ZOA's tax-exempt status as a not-for-profit entity.

39.     The actions of Defendants were intentional, amounting to an abuse of power, and constituted fraud.  Plaintiff believes that the motivation to terminate ARFA was to keep her quiet about the tax issue, allowing them to continue deceiving donors, thereby safeguarding their positions of power and, in the case of KLEIN, his inflated salary.

40.     Defendants' termination of Plaintiff to silence her opposition violated the clear mandates of California's public policy as established by common law and statute, including but not limited to Cal. Lab. Code §1102.5.  Plaintiff was engaging in protected activity by investigating, reporting and refusing to participate in potentially illegal activity by the organization and its management, board of directors and employees.

41.     As a direct and proximate result of the aforementioned conduct of Defendants, Plaintiff has suffered past and future economic and non-economic damages in amounts to be proven at trial.

42.     The acts of Defendants were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages according to proof at trial pursuant to California *Civil Code* section 3294.

## SECOND CAUSE OF ACTION

## WRONGFUL TERMINATION -- GENDER DISCRIMINATION

### (Against All Defendants)

43.     Plaintiff hereby incorporates by reference all foregoing paragraphs of this Complaint, as though fully set forth herein.

44.     Despite performing her job function admirably, Plaintiff was required to increase fund-raising, beyond that done by other regional directors.  Those other directors, who were all male, were much less effective as programmers and administrators, and yet were not required to fund-raise anywhere near the rate at which ARFA was.

45.     Plaintiff believes that this disparate treatment was due in part to her concerns about the tax issue and in part to her being female.

46.     Plaintiff was discriminated against in working conditions and ultimately terminated because she was a women, in violation of Cal. Govt. Code §12940, *et seq.*

47.     As a direct and proximate result of the aforementioned conduct of Defendants, Plaintiff has suffered past and future economic and non-economic damages in amounts to be proven at trial.

**COMPLAINT**

48.     The acts of Defendants were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages according to proof at trial pursuant to California *Civil Code* section 3294.

### THIRD CAUSE OF ACTION

### CIVIL CONSPIRACY

**(Against All Defendants)**

49.     Plaintiff hereby incorporates by reference all foregoing paragraphs of this Complaint, as though fully set forth herein.

50.     Each of the Defendants was aware that the others planned to terminate ARFA because of her concerns over the tax issue and because she was a woman.

51.     Each of the Defendants agreed and intended that ARFA should be fired for these reasons and participated or facilitated the firing.

52.     As a direct and proximate result of the aforementioned conduct of Defendants, Plaintiff has suffered past and future economic and non-economic damages in amounts to be proven at trial.

53.     The acts of Defendants were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages according to proof at trial pursuant to California *Civil Code* section 3294.

### FOURTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(Against All Defendants)**

54.     Plaintiff hereby incorporates by reference all foregoing paragraphs of this

-12-

**COMPLAINT**

1 | Complaint, as though fully set forth herein.

2

3 |     55.    Defendants' conduct as alleged herein was so outrageous as to cause Plaintiff

4 | to suffer severe emotional distress over an extended period. This stress was unrelated to and

5 | beyond that of her normal job description and duties.

6

7 |     56.    Defendants acted with reckless disregard to the probability of causing Plaintiff

8 | emotional distress by their outrageous conduct, including requiring her, as a condition of her

9 | employment, to act unethically and illegally, threatening her with termination if she did not

10 | violate the law by concealing material information from potential donors and the public, and

11 | subjecting her to harassing telephone calls at all hours of the day and night.

12

13 |     57.    Plaintiff suffered severe emotional distress proximately caused by Defendants'

14 | conduct. Defendants' conduct was a substantial factor in causing Plaintiff severe emotional

15 | distress.

16

17 |     58.    As a proximate and legal result of the conduct of Defendants, Plaintiff has

18 | suffered damages exceeding the jurisdictional limits of this Court in an amount to be proven

19 | at trial.

20

21 | **FIFTH CAUSE OF ACTION**

22 | **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

23 | (Against all Defendants)

24 |     59.    Plaintiff hereby incorporates by reference all foregoing paragraphs of this

25 | Complaint, as though fully set forth herein.

26

27 |     60.    Defendants' conduct as alleged herein caused Plaintiff to suffer severe

28 | emotional distress over an extended period. This stress was unrelated to and beyond that of

**COMPLAINT**

1 her normal job description and duties.

2

3     61.    Defendants acted with a negligent disregard of the probability that Plaintiff

4 would suffer emotional distress.

5

6     62.    Plaintiff's severe emotional distress was proximately caused by Defendants'

7 conduct, and Defendants' negligent conduct was a substantial factor in causing Plaintiffs'

8 severe emotional distress.

9

10     63.    As a proximate and legal result of the conduct of Defendants, and each of

11 them, as described hereinabove, Plaintiff has suffered damages exceeding the jurisdictional

12 limits of this Court in an amount to be proven at trial.

13

14 **SIXTH CAUSE OF ACTION**

15 **UNFAIR BUSINESS PRACTICE**

16 (Against all Defendants)

17     64.    Plaintiff hereby incorporates by reference all foregoing paragraphs of this

18 Complaint, as though fully set forth herein.

19

20     65.    Defendants' conduct as alleged herein was unlawful, unfair and fraudulent and

21 therefore violates California's Unfair Competition Law, Cal. Bus. Prof. Code §§17200, *et*

22 *seq.*,

23

24     66.    Defendants' conduct was unlawful in that it violated, *inter alia*, Cal. Gov.

25 Code §12900, *et seq.*, (particularly Cal. Govt. Code §12940), Cal. Lab. Code §1102.5, as

26 well as Internal Revenue Service reporting statutes.

27

28     67.    Defendants' conduct was unfair by (1) subjecting Plaintiff to disparate

-14-

**COMPLAINT**

1    treatment, including stricter terms and conditions of employment and ultimate termination,

2    because of her gender; (2) requiring employees, including Plaintiff, at the risk of losing their

3    jobs, to engage in unethical and illegal activity; (3) harassing, threatening to terminate and

4    ultimately terminating Plaintiff because of here unwillingness to, and/or expressing her

5    apprehension and moral objection to, participating in unethical and illegal activity

6

7        68.    Defendants' conduct was fraudulent in that it perpetrated a scheme to actively

8    conceal material information from the public, and specifically from potential donors, and to

9    require its employees to participate in the scheme against their will.  Defendants did not

10   inform potential donors -- and instructed its employees and volunteers to conceal -- that the

11   ZOA has lost its 501(c)(3) status or the gross mismanagement at the national level of the

12   ZOA that resulted in the required Form 990s not to be filed.  In addition, Defendants told

13   donors -- and instructed ZOA employees and volunteers to tell donors -- to send donations

14   for the ZOA to FJC, without informing them that the FJC is an entirely different

15   organization from the ZOA, that the FJC is not legally obligated to transfer the money to the

16   ZOA ever and is not even permitted to transfer the money to the ZOA unless and until the

17   ZOA reestablishes its 501(c)(3) tax-exempt status, or that, even if the FJC does eventually

18   transfer the money to the ZOA, it will retain an initial as well as yearly commission before

19   doing so.

20

21       69.    Plaintiff alleges that, as a direct and proximate result of Defendants' unfair

22   business practices, Plaintiff has suffered damages, in an amount to be proven at trial.

23

24       WHEREFORE, Plaintiff prays for judgment against defendants as follows:

25       1.     For consequential and incidental damages according to proof;

26       2.     For general damages, according to proof;

27       3.     For special damages, according to proof;

28       4.     For exemplary damages, according to proof;

5.      For statutory damages and costs, including reasonable attorneys' fees and costs of suit;

6.      For such other and further relief as may be proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff ORIT ARFA demands a trial by jury on all claims triable to a jury under California law and the Seventh Amendment to the Constitution of the United States.

Dated: March 25, 2013                    **THE ALTMAN LAW GROUP**

By:_____
Bryan C. Altman, Esq.
Joel E. Elkins, Esq.
Attorneys for Plaintiff ORIT ARFA

-16-

**COMPLAINT**

# EXHIBIT A

Orit Aria

| | |
|---|---|
| **From:** | David Drimer |
| **Sent:** | Wednesday, March 20, 2012 9.08 AM |
| **To:** | StuartPavilack GMAIL; Kobi Erez (kobi@mizoa.org); Philadelphia Forward; Joseph Sabag; Orit Aria, tkom@kormtax.com |
| **Cc:** | Stanley Kessock |
| **Subject:** | talking points, internal breifing info. donor copy, etc. |
| **Attachments:** | ZOA tmp chng tx stts 2 tk.docx; FJC IRS Tax Exempt Determination Letter.pdf |

Team:

We acknowledge there have been inquiries from the regional directors regarding how to deal with questions regarding our temporary change in tax status both from major donors and internal stakeholders.

In general, please do not broach this subject with donors unless it is absolutely necessary or they ask about it specifically. We firmly believe we can turn this around quickly through **retroactive reinstatement** so that assertively publicizing the current state of affairs will not be advantageous for the short and long-term interests of the ZOA. On the other hand, family foundations or Federation-related donor funds, et al. will stumble onto our tax status issues organically. We do need to be prepared.

Below (in blue) is language for addressing the need to revise the way donors address checks plus the preferential order for how those checks need to be made out. Attached are **talking points** for dealing with internal inquiries and I encourage you to brief your local Board members as soon as possible and ask for their confidentiality while we remediate the situation with the IRS.

You will also find attached an IRS determination letter for the Foundation for the Jewish Community (FJC ORG), the administrators of the **"ZOA Donors Fund."** This can be shared with: 1. large direct contributors, 2. foundations and 3. other donor advised funds , etc.

Again, I remind you to keep an accurate accounting of all monies received using your normal procedures but do not deposit checks in the bank. Send them to Stan Kessock here in New York

As always, if you, your board members or donors have any questions or concerns they wish to discuss regarding this matter, please don't hesitate to call either me or Stan Kessock at any time.

Best regards,

Dave

"The ZOA has recently chosen to manage its endowment through a donor advised fund managed by the Foundation for the Jewish Community (FJC.org). Donations to the "ZOA Donor Fund" are fully tax-deductible, thank you for your generosity by making out your donations out of which ZOA is a beneficiary Organization or Another"

In order of preference, ask that you make checks out to—

1.  Checks to ZOA as Donor/Trust for ZOA Donors Fund

Or

1

2.   Checks for ZOA – ZOA Donor Fund

c.

*   Make more ZOA Gains, based on message line #2

David Drimer
National Executive Director
ZIONIST ORGANIZATION OF AMERICA (ZOA)
212.481.1500, ext. 246
ddrimer@zoa.org
www.zoa.org

[illegible fine print paragraph]

Talking Points:
ZOA's Temporary Change in Tax Status

I. What happened?

  A. Due to a change in IRS rules in 2006 that went into effect in 2008, 300,000 not-for-profit
     (NFP) organizations had their tax free status revoked without warning in 2011

  B. Unknown to anyone in management here, ZOA's not-for-profit status was revoked by
     the IRS in May, 2011  We were not informed until February 22, 2012
     1. Important note: all donations received from May 15 through February 22 remain tax
        deductible for the donors and tax free for the ZOA

  C. Even our auditors (Loeb & Troper) — widely-regarded as the best Jewish not-for-profit
     accounting firm in New York — were unaware of this IRS action.
     1. This was a computer-generated "auto-revocation"
        i   No committee or individual determined this; there is no political subtext
            ➢ The reason we were revoked is based on a misunderstanding regarding
              the deadline date for filing the annual 990 tax returns required of an NFP
              organization
            ➢ Every year (2008, 2009, 2010) we filed for an automatic 6-month
              extension on filing our return
            ➢ We believed — and our auditors concurred -- that we had until November
              15, 2011 to file form 990 for 2008 with the IRS. This belief was in error;
              we really only had until May 15, 2011.
        ii  We appropriately relied on our accountants to counsel us accurately; they
            failed to do that, though it was clearly within their professional responsibility
            to do so.

  D. We missed the deadline while trying to obtain *audited financial statements* for the years
     in question. We could have filed in each of those years based on *unaudited statements*
     1. We didn't get caught doing a "bad thing." We missed a technical filing deadline
        trying to do the "best thing."
     2. Our accountants had full knowledge of this strategy and they agreed with it.

II. What are we doing about it?

  A. We are filing for *retroactive reinstatement* to the date of cancellation
  B. We have hired pro bono tax counsel to represent us in this matter
     1. He will guide our reapplication and appeal strategy, review filings and vet public
        statements to ensure compliance.
     2. Based on his advice, we are immediately addressing all organizational and financial
        issues likely to be scrutinized by the IRS in the application review process.
     3. We set-up a "Donor Advised Fund" with the *Foundation for the Jewish Community*
        (FJC.org), a 501(c)(3) charitable foundation.

a. There will be no interruption in our ability to fundraise to support the future work of the ZOA; all funds collected go directly into the Foundation account

b. All donations made to the "ZOA Donors Fund" at FJC.org will be fully tax deductible
   > The one caveat: we cannot touch that money until we get our 501(c)(3) tax status reinstated
   > When reinstated, we will advise FJC to donate the money to the ZOA
   > This is entirely legal, even common, for organizations dealing with similar challenges; this plan has been approved by our attorney

c. We are working with our accountants on a two-pronged strategy: a  continuing to *audit* 2009, 2010, 2011 and b. preparing *unaudited* financial statements for those years to file 990's along with our application and appeal
   iii  We have more Loeb & Troper personnel working on our account than ever before
   iv  We are seeking "expedited review" of our application and appeal by the IRS.
   v   The process of getting reinstated could possibly take less than 6 months, but it is prudent to plan for from 6 months to one year.

III.  Until we are reinstated, what are the consequences?

A.  All regions must come under very strict organizational and financial control by National
   1.  Regional offices can make payments out of their bank accounts
      a.  They may NOT collect and deposit donations, all donations they collect must be forwarded to FJC.
      b.  ZOA National will provide operating subsidies when appropriate.
B.  We are a for-profit entity subject to income tax and we are required to file a tax return.
   1.  There will be no income tax liability, however, as we will show a net loss for the year (2012).
C.  Until such time as all current vendor discounts and tax rebates are reviewed (e.g., USPS, property tax), it is prudent to assume some of these budgetary line items will be affected – resulting in higher operating costs.
   1.  ZOA is doing its best to minimize any of these costs.
D.  We need to negotiate with the IRS to maintain our retirement accounts without modification
   1.  We have retained another attorney who specializes in this area (ERISA law). He is confident there will be no interruption in our retirement savings plans.

IV.  The Future

A  We need to be prudent in how we spend ZOA's institutional funds, but we are committed to pursuing our mission as vigorously as ever.
B.  We will emerge from this a better managed organization, operating in total compliance with all regulatory mandates and IRS rules.

C. We will be more attractive to the donor community and better poised for growth via increased programming and membership building activities when we emerge from this period

INTERNAL REVENUE SERVICE
DISTRICT DIRECTOR
G.P.O. BOX 1680
BROOKLYN, NY 11202

DEPARTMENT OF THE TREASURY

Date:

0 6 FEB 1995

THE FOUNDATION FOR THE JEWISH
COMMUNITY
C/O JOEL DERBY, EXEC. DIRECTOR
150 EAST 58TH STREET,
NEW YORK, NY 10155

Employer Identification Number:
    13-3848562
Case Number:
    115333012
Contact Person:
    J. MOSES
Contact Telephone Number:
    (718) 488-2971

Accounting Period Ending:
    MARCH 31
Foundation Status Classification:
    509(a)(1)
Advance Ruling Period Begins:
    SEPTEMBER 15, 1995
Advance Ruling Period Ends:
    MARCH 31, 2000
Addendum Applies:
    YES

Dear Applicant:

Based on information you supplied, and assuming your operations will be as
stated in your application for recognition of exemption, we have determined you
are exempt from federal income tax under section 501(a) of the Internal Revenue
Code as an organization described in section 501(c)(3).

Because you are a newly created organization, we are not now making a
final determination of your foundation status under section 509(a) of the Code.
However, we have determined that you can reasonably expect to be a publicly
supported organization described in sections 509(a)(1) and 170(b)(1)(A)(vi).

Accordingly, during an advance ruling period you will be treated as a
publicly supported organization, and not as a private foundation. This advance
ruling period begins and ends on the dates shown above.

Within 90 days after the end of your advance ruling period, you must
send us the information needed to determine whether you have met the require-
ments of the applicable support test during the advance ruling period. If you
establish that you have been a publicly supported organization, we will classi-
fy you as a section 509(a)(1) or 509(a)(2) organization as long as you continue
to meet the requirements of the applicable support test. If you do not meet
the public support requirements during the advance ruling period, we will
classify you as a private foundation for future periods. Also, if we classify
you as a private foundation, we will treat you as a private foundation from
your beginning date for purposes of section 507(d) and 4940.

Grantors and contributors may rely on our determination that you are not a
private foundation until 90 days after the end of your advance ruling period.
If you send us the required information within the 90 days, grantors and
contributors may continue to rely on the advance determination until we make
a final determination of your foundation status.

Letter 1045 (DO/CG

# EXHIBIT B

# SETON & ASSOCIATES

A LAW CORPORATION

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4948 Info@setonlawgroup.com
www.setonandassociates.com

## M E M O R A N D U M

From:  Kent E. Seton, Esq.

Date:  July 30, 2012

Re:  Potential Liability of Individual Members of the Board of Directors of The Zionist
Organization of America under State and Federal Law for Failure to Disclose Loss of
Tax-Exempt Status to Charitable Donors

---

In response to the revocation by the Internal Revenue Service ("IRS") of the tax-exempt
status of The Zionist Organization of America ("ZOA"), you have asked us to examine whether
the individual members of the Board of Directors (the "Board") of the ZOA could face potential
liability under applicable state and Federal law with respect to (1) the failure to disclose the loss
of tax-exempt status to charitable donors generally, and (2) exposure arising from selective
disclosure of the loss of tax-exempt status to an isolated few of its existing charitable donors, and
to an even fewer number of its potential charitable donors. This Memorandum sets forth our
analysis based on our telephone conversations with Steven M. Goldberg ("Goldberg"), National
Vice Chairman of the ZOA, and/or writings received from Mr. Goldberg and/or publicly
available sources.

## I.   FACTS

We understand:

(i)      The ZOA is a non-profit[1] charity that was incorporated in the State of New York.

(ii)     The ZOA's current Board consists of 38 members, all of whom serve without
compensation, except for the National President. Article XIII, Section 2(a) of the Constitution of
the ZOA adopted at the 96th National ZOA Convention held in New York in 2010 (the
"Constitution") provides that the Board of Directors shall consist of (a) all elected and appointed
Officers other than Honorary Officers; (b) up to 16 members who shall be elected by the Board;
and (c) up to 30 members who shall be appointed by the National President.

---

[1] The ZOA is currently classified as a "domestic not-for-profit corporation" according to the official
website of the Department of State of New York. Non-profit status refers to incorporation status under
state law, while tax-exempt status refers to federal income tax exemption under the Internal Revenue
Code.

1

# SETON & ASSOCIATES

A LAW CORPORATION

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4948 Info@setonlawgroup.com
www.setonandassociates.com

(iii).   The Board has not adopted any by-laws for the ZOA notwithstanding the directive of Article XIII, Section 1(c) for the Board to "establish and promulgate by-laws…" Note that we have not reviewed the ZOA certificate or incorporation and our analysis remains subject to further review of same.

(iv)   Morton A. Klein currently serves as the National President of the ZOA (the "National President"), has served in such capacity for approximately 18 years, received total compensation exceeding $700,000 during calendar year 2011, not including expense and travel reimbursements, has appointed a majority of the current Board members pursuant to the Constitution, and is a member of the ZOA Board.

(v)   By notice dated February 13, 2012 (the "IRS Notice"), addressed to the ZOA national headquarters office located at 4 East 34th Street, New York, NY, 10016-4333 (the "National Office"), the ZOA was informed by the IRS that its tax-exempt status has been revoked automatically as required by law, effective May 15, 2011 (the "Revocation Date"), due to the ZOA's failure to file IRS Form 990s for three consecutive years.

(vi)   The IRS Notice further provides that the IRS:

(1)   had not received any response from the ZOA to prior correspondence issued by the IRS and addressed to the ZOA National Office requesting the ZOA to file its annual information returns; and

(2)   because the ZOA is no longer tax-exempt, the ZOA cannot receive tax-deductible contributions and will be included in the IRS list of organizations that are no longer tax-exempt and published on the www.irs.gov/eo website which is available to the public, state charity officials and state tax officials.

(vii)   As of the date of this writing, the delinquent IRS Form 990s have not yet been filed, so the ZOA cannot initiate an appeal or file a request for reinstatement of its tax-exempt status at this time.

(viii)   As of the date of this writing, the ZOA website (www.zoa.org) does not inform donors and/or prospective donors that it has lost its tax-exempt status, but rather seamlessly transfers donors to a separate webpage entitled "FJC – A Foundation of Philanthropic Funds, Reference: ZOA Donor Fund" (the "FJC").

(ix)   The FJC Summary of Procedures and Rules for Collective Giving Accounts and/or the FJC Collective Giving Letter Agreement provide:

2

# SETON & ASSOCIATES

### A LAW CORPORATION

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile: (213) 947-4948 info@setonlawgroup.com
www.setonandassociates.com

(1) all funds received by FJC will be subject to fees, which for the initial term of this Agreement shall generally be (A) an initial fee of two-five percent (2-5%) of all funds received by FJC designated for the Group, plus (B) an annual fee of one percent (1%) of the average daily balance of the assets held in the Collective Giving Account;

(2) the FJC has the right to reject contributions of any asset and to close such account at any time and for any reason;

(3) the FJC owns the assets in each Collective Giving Account outright and has complete control over them for the charitable purposes of FJC. The Advisors (i.e., ZOA) do not have any power to restrict the absolute rights of FJC as owner of the assets (Emphasis added); and

(4) the FJC will distribute funds contributed, and income earned by these funds, generally to charitable organizations described in Sections 501(c)(3) and 509(a)(1), (2), or (3) of the Internal Revenue Code as it now exists or as it may be amended.

(x) As of the date of this writing, certain ZOA Regions, including without limitation, the ZOA – Michigan Region, falsely state that the ZOA is a 501(c)(3) non-profit organization, which misrepresentation has a direct nexus to the National ZOA since Article VII, Section 1(a) of the Constitution provides that "[a]ll funds, ... raised or collected for or by the Zionist Organization of America by any Region or District ... shall become the property of the Zionist Organization of America through its National Organization immediately upon collection thereof."

(xi) The ZOA has established a standing Governance and Compliance Committee consisting of at least four members of the ZOA Board, including Goldberg.

(xii) The ZOA has selectively disclosed the loss of its tax-exempt status on a case-by-case isolated basis to few of its prior and/or existing charitable donors, and likely to an even fewer number of its potential charitable donors. At least one donor who controls a nonprofit entity, when informed that the ZOA had lost its tax exempt status, stated that he was uncertain if his organization, pursuant to its own mission and rules, would be able to donate to the ZOA at the present time in light of its tax-exempt revocation, further highlighting the materiality of the information.

(xiii) Goldberg, in his capacity as the National Vice Chairman of the ZOA, has expressed concern that the ZOA's failure to disclose the loss of its tax-exempt status to its charitable donors and the establishment of a relationship with the FJC by which the FJC and not

3



## SETON & ASSOCIATES

A LAW CORPORATION

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4948 Info@setonlawgroup.com
www.setonandassociates.com

the ZOA retains complete control over the contributed assets, exposes the ZOA, the Board, and the individual ZOA directors and officers, to liability.

(xiv)   The National President has expressed his beliefs:

(1)   that the ZOA's accounting firm, Loeb & Troper, LLP, alone, which was hired to prepare the IRS Form 990s, has sole responsibility for the ZOA's loss of its tax-exempt status;

(2)   the decision to utilize the FJC to act as the recipient of charitable funds received from donors of ZOA during the loss of its tax-exempt status is sufficient to protect ZOA donors from disqualification of their charitable contributions after the Revocation Date; and

(3)   there is no need to notify ZOA donors as to the loss of ZOA's tax-exempt status.

## II.   FINDINGS

1.   Based on what has occurred, it appears that there was a failure to establish and implement internal controls to ensure that the ZOA operates according to the law and its governing framework to maintain the ZOA's compliance with its desired and contemplated IRC Section 501(c)(3) status.

2.   According to the information you have provided us, the Board did not perform its oversight duties and ceded all internal financial controls and reporting procedures to the National President and by not insisting on the distribution of the ZOA financial reports and tax returns not less frequently than annually.

3.   The Board failed to satisfy its duty of obedience to the organization by insuring its compliance with all appropriate laws, including with respect to the New York State Department of Taxation and the IRS, and its inability to be in a position to satisfy its obligations to provide copies of its federal reports (IRS Form 990) and its financial reports if, as and when requested by members of the public.

4.   The power vested in the National President to appoint a majority of the Board members (up to 30 members pursuant to Article XIII, Section 2(c) of the Constitution) creates the possibility and even likelihood of a conflict of interest by the National President because of his power and control over the composition of the Board.

4



## SETON & ASSOCIATES
A LAW CORPORATION

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4948 info@setonlawgroup.com
www.setonandassociates.com

5.    Once the Board, and its standing committee, the Governance and Compliance Committee, were made aware of the loss of the ZOA's tax-exempt status, it should have recognized the potential risk to the ZOA community and its reputation. Instead, it appears the Board and the Governance and Compliance Committee (other than Goldberg), as governing bodies, failed to inquire reasonably and to demand detailed information from the National President.

6.    A donor likely has a valid claim that the individual Board members had a legal responsibility to ensure that the ZOA disclosed the loss of the organization's tax-exempt status in a transparent fashion, including posting on the ZOA website, issuing a press release, and sending letters to its donor list. There is an affirmative duty for the ZOA and its Board members to disclose these facts since the ZOA has a duty to the public to represent fairly and accurately its tax exempt status.

7.    A donor potential has a legitimate claim for breach of fiduciary duty and fraud against both the ZOA and the individual members of the Board if a deduction taken by a donor were disallowed. In addition, even if the deduction were not disallowed, a donor may claim that the donor was misled into believing that the ZOA were a tax-exempt organization and that the donor would not have made the donation if accurate information had been disclosed. In our opinion an affirmative duty to disclose does exist. Accordingly, a donor likely has a very strong claim against not only the ZOA but also the individual Board members. In addition, a donor may seek rescission to force the ZOA to return the donation based upon a claim that the misrepresentation that the charity is a qualifying organization nullified the bargained for consideration.

8.    The ZOA's failure to file the requisite IRS Form 990s could result in penalties against the ZOA and its "responsible persons."

## III.   DISCUSSION AND ANALYSIS

A.    Is there an affirmative obligation on the part of the Board of the ZOA to disclose the loss of its tax-exempt status to its actual and potential charitable donors, and, if so, if a donor is "injured" by reason of such non-disclosure, would this subject the individual members of the Board of ZOA to personal liability for those injuries?

New York state law vests the power to manage nonprofit corporations in the board of directors. Section 701(a) of the New York Not-For-Profit Corporation Law (the "NPCL") provides in pertinent part: "Except as otherwise provided by the certificate of incorporation, a



**A LAW CORPORATION**

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4948 info@setonlawgroup.com
www.setonandassociates.com

corporation shall be managed by its board of directors." From a legal perspective, the Board and its members, individually, have three fundamental duties:

(1)     **Duty of Care,** which is taking the care and exercising the judgment that any reasonable and prudent person would exhibit in the process of making informed decisions, including acting in good faith consistent with what a member of the Board truly believes is in the best interest of the organization. The law recognizes and accepts that Board members may not always be correct in their choices or decisions, but it holds them accountable for being attentive, diligent, and thoughtful in considering and acting on a policy, course of action, or other decision. Active preparation for and participation in board meetings where important decisions are to be made is an integral element of the duty of care. This standard of care is codified by New York law in Section 717(a) of the NPCL which provides in its entirety as follows:

"§ 717. Duty of directors and officers.

(a)  Directors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions. In the administration of the powers to make and retain investments pursuant to section 512 (Investment authority), to appropriate appreciation pursuant to section 513 (Administration of assets received for specific purposes), and to delegate investment management of institutional funds pursuant to section 514 (Delegation of investment management), a governing board shall consider among other relevant considerations the long and short term needs of the corporation in carrying out its purposes, its present and anticipated financial requirements, expected total return on its investments, price level trends, and general economic conditions."

This standard considers the "position" and "circumstances" and, therefore, will impose varying standards, depending upon the status of the individual Board member and the nature of the action being evaluated. For example, board members are generally held to a higher standard when the action being questioned involves extraordinary or controversial action by the corporation, such as the purchase or sale of a major asset or any other major transaction not in the ordinary course of action.

(2)     **Duty of Loyalty,** which calls upon the Board and its members to consider and act in good faith to advance the interests of the organization. In other words, Board members will not authorize or engage in transactions except those in which the best possible outcomes or terms for the organization can be achieved. This standard constrains a Board member from participating in Board discussions and decisions when they as an individual have a conflict of

6



# SETON & ASSOCIATES

A LAW CORPORATION

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4948 info@setonlawgroup.com
www.setonandassociates.com

interest (i.e., their personal interests conflict with organizational interests, or they serve multiple organizations whose interests conflict).

There has been no intimation that any inappropriate personal benefits have arisen from conflicts of interest and/or self-dealing transactions. Nonetheless, it is appropriate to note that IRC Section 501(c)(3) prohibits organization assets from being used primarily for the benefit of an individual. An organization can pay employees adequate salaries and benefits without violating this provision. Also, an activity that benefits the organization is permitted even if an individual receives a benefit. However, the Board should determine what the benefit is to the organization before an activity may be implemented, and the minutes should reflect the benefits of the activity. If the Board determines that the primary benefit is to an individual, then the activity should not be implemented. If this requirement is violated and private benefit is found, the organization's tax-exempt status may be lost. In addition to possible loss of exempt status of the organization, under the intermediate sanctions rules effective September 14, 1995, if a person who was in a position to exercise substantial influence over the organization anytime in the past five years receives an "excess benefit", that person must make the organization whole (e.g., return the excess benefit, plus interest) and is subject to a substantial penalty (ranging from 25% to 200% of the excess benefit). Further, anyone approving the excess benefit (e.g., the directors) are subject to a penalty of 10% of the excess benefit, up to $10,000 per transaction. In reviewing any transaction, a director must make sure that the activity does not result in "private benefit."

Notwithstanding the foregoing, acts and failure to act by the National President are implicated by the lack of prompt notification to the Board of the ZOA's loss of its tax exempt status. (See discussion in Section B below re reasonable reliance).

(3) **Duty of Obedience**, which requires obedience to the organization's mission, bylaws, and policies, as well as honoring the terms and conditions of other standards of appropriate behavior such as laws, rules, and regulations. The New York State Department of Law Charities Bureau issued a publication entitled "Right From the Start: Responsibilities of Directors and Officers of Not-For-Profit Corporations" by then Attorney General Andrew M. Cuomo to assist current and future boards of directors and officers of New York not-for-profit corporations to understand and carry out their fiduciary responsibilities to the organizations they serve. A copy of that publication is attached hereto and also may be accessed on the internet at the following link: http://old.usitt.org/documents/362.pdf. Importantly, that publication provides that a board has a duty of obedience to insure that the organization complies with applicable laws and regulations and its internal governance documents and policies, including:

(x) Complying with all appropriate laws, including registering with the Attorney General's Charities Bureau in New York State, complying with the registration and reporting laws and other applicable laws of all states in which it conducts activities

# SETON & ASSOCIATES

### A LAW CORPORATION

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4948 info@setonlawgroup.com
www.setonandassociates.com

and/or solicits contributions, filing required financial reports with the Attorney General, ... the State Department of Taxation and Finance and the Internal Revenue Service ...

(y)     Providing copies of its applications for tax-exempt status (IRS Form 1023), federal reports (IRS Forms 990, 990 PF, 990 EZ) and its financial reports filed with the Attorney General's Charities Bureau to members of the public who request them.

The Board failed to satisfy its duty of obedience to the organization by insuring its compliance with all appropriate laws, including with respect to the New York State Department of Taxation and the IRS, and its inability to be in a position to satisfy its obligations to provide copies of its federal reports (IRS Form 990) and its financial reports filed with the Attorney General's Charities Bureau to members of the public who request them.

The ZOA's failure to file an IRS Form 990, in addition, could result in penalties against the ZOA and its "responsible persons." An IRS Form 990 must be filed annually in order to give the IRS and the public information about the ZOA's operations. A charitable organization's failure to timely and accurately file an IRS Form 990 can result in penalties, which may be reduced if the charitable organization demonstrates "reasonable cause" for the failure in a written statement (IRC Section 6652(c)(3)). The severity of the penalties is dependent in part upon whether a charity's gross receipts exceed $1.0 million. In light of the ZOA's annual multi-million dollar gross receipts, the ZOA is subject to a penalty of $100 per day, not to exceed $50,000 for any one tax return (IRC Section 6652(c)(1)(A)). Also, a penalty of $10 per day, not to exceed $5,000, may be imposed against each "responsible person" at the ZOA who failed to file the IRS Form 990 after the deadline set forth by the IRS in a letter addressed to the ZOA (IRC Section 6652(c)(1)(B)). Additional penalties against "responsible persons" who willfully did not file the IRS Form 990, including fines and imprisonment, are set forth in Sections 7203, 7206, and 7207 of the Internal Revenue Code.

Pursuant to IRC Section 170, donations to "qualifying" organizations are tax deductible to the donor up to 50% of the donor's adjusted gross income if the organization is a "public charity" as defined under Section 509 of the Internal Revenue Code. An organization ceases to be a recognized charity if its status is revoked by the IRS (IRC Section 6033(j)). Revocation of a charity's status is automatic upon the failure of the organization to file its annual information returns for three (3) consecutive years. The facts surrounding the loss of the ZOA's tax exempt status are incontrovertible. Simply put, ZOA failed to file its returns for three (3) consecutive years and its tax-exempt status was revoked effective May 15, 2011. Pursuant to IRC Section 6033(j), once the IRS published the notice of the revocation in its electronic "automatic revocation" list (the "List"), on February 22, 2012, the ZOA was no longer a "qualifying organization" under IRC Section 170. Under federal law, once the List was published, a donor is deemed to have notice that any contributions are not allowable. ZOA's efforts to defend any

8



A LAW CORPORATION

8730 Wilshire Boulevard, Suite 4E0, Deverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4948 info@setonlawgroup.com
www.setonassociatesnlaw.com

donor lawsuit by shifting the burden to the donor for failure to check the List will not be sustained. Further, it is our opinion that a donor may have a valid claim that the individual Board members had a duty to ensure that the ZOA disclosed the loss of the organization's tax-exempt status in a transparent fashion, including posting on the ZOA website, issuing a press release, and sending letters to its donor list. We believe there is an affirmative duty for the ZOA and its Board members to disclose these facts since the ZOA has a duty to the public to represent fairly and accurately its tax exempt status.

A donor may have a very strong claim for breach of fiduciary duty and fraud against both the ZOA and the individual Board members if a deduction taken by a donor were disallowed. In addition, even if the deduction were not disallowed, a donor may claim that the donor was misled into believing that the ZOA were a tax-exempt organization and that the donor would not have made the donation if accurate information had been disclosed. As of the date of this writing, certain ZOA Regions, including without limitation, the ZOA – Michigan Region, falsely state that the ZOA is a 501(c)(3) non-profit organization, which misrepresentation has a direct nexus to the National ZOA since Article VII, Section 1(a) of the Constitution provides that "[a]ll funds, ... raised or collected for or by the Zionist Organization of America by any Region or District ... shall become the property of the Zionist Organization of America through its National Organization immediately upon collection thereof." This is clear misrepresentation.

Further, where a donor earmarks funds for a specific activity, the Board must ensure that the funds be used in that particular way. For example, country singer Garth Brooks recently won a lawsuit (January 2012) against an Oklahoma hospital (*Brooks v. Integris Concordia Valley Regional Hospital*) for the return of his $500,000 donation because the hospital did not use the money for the specific purpose of building and naming a women's center after his mother. Brooks also was awarded $500,000 in damages. In another example, the California Attorney General sued directors and officers of the Monterey County AIDS Project ("MCAP") for alleged misappropriation and misapplication of a $2.8 million donation and also breach of the duty of care for failure to properly oversee the use of funds. The settlement (also January 2012) created a $1.0 million fund dedicated to the original earmark of the donation – to provide housing for individuals with HIV/AIDS – and barred 16 former MCAP officers and directors from serving as a fiduciary of any California charity for at least five years.

Donations made to the ZOA after the Revocation Date presumably were made to advance the objectives and purposes of the ZOA, but it is unlikely that donors understand that their contributions have actually been made to another organization and that the ZOA does not have control over those donations. As indicated previously, the FJC Summary of Procedures and Rules for Collective Giving Accounts and/or the FJC Collective Giving Letter Agreement provide that: (i) all funds received by FJC will be subject to fees, which for the initial term of this Agreement shall generally be (A) an initial fee of two-five percent (2-5%) of all funds received by FJC designated for the Group, plus (B) an annual fee of one percent (1%) of the average daily



SETON & ASSOCIATES

A LAW CORPORATION

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4948 info@setonlawgroup.com
www.setonandassociates.com

balance of the assets held in the Collective Giving Account; (ii) the FJC has the right to reject contributions of any asset and to close such account at any time and for any reason; (iii) the FJC owns the assets in each Collective Giving Account outright and has complete control over them for the charitable purposes of FJC. The Advisors (i.e., ZOA) do not have any power to restrict the absolute rights of FJC as owner of the assets (Emphasis added); and (iv) the FJC will distribute funds contributed, and income earned by these funds, generally to charitable organizations described in Sections 501(c)(3) and 509(a)(1), (2), or (3) of the Internal Revenue Code as it now exists or as it may be amended. Since the ZOA has lost its tax-exempt status, we understand that all of those contributions are being "warehoused" at the FJC, and not distributed to the ZOA. In our opinion, a donor has a right to know these facts, the ZOA has a duty to disclose, and therefore a donor may have a very strong claim against not only the ZOA but also the individual Board members. The materiality of the loss of tax exempt status is clearly demonstrated by the statement expressed by at least one large donor who controls a nonprofit entity that he was uncertain if his organization, pursuant to its own mission and rules, would be able to donate to the ZOA at the present time in light of its tax-exempt revocation. In addition, a donor may seek rescission to force the ZOA to return the donation based upon a claim that the misrepresentation that the charity is a qualifying organization nullified the bargained for consideration.

While we believe the failure to disclose is inexcusable, compounding that failure are the troubling actions by the ZOA to selectively disclose the loss of tax-exempt status on a case-bay-case isolated basis to only a few of the organization's most prominent donors, and to even a fewer number of its potential donors. In an effort to avoid the consequences of bad publicity, the National President has repeatedly concealed the critical loss of tax-exempt status, at least initially from the ZOA Board, and continues to conceal these facts from the ZOA community and the public at large. This discouragement of discussion and dissent, and avoidance of bad publicity reveals a striking failure by the National President and the Board to exercise its oversight functions by not having regular reporting procedures or committee structures in place to ensure disclosure to the Board of major risks to the ZOA. One need look no further than the recent actions by the Pennsylvania State University related to the child sexual abuse committed by Jerry Sandusky to view a roadmap of how not to operate.

Further, selective dissemination of material nonpublic information is prohibited by the Securities and Exchange Commission ("SEC"). Indeed, SEC Regulation FD is a specific set of rules set up by the SEC in 2000 in response to a practice where public companies provided information to securities analysts and selected institutional investors before they released it to the general public. All reporting companies are subject to Regulation FD. A reporting company must make public any material, nonpublic information (oral or written) disclosed by a covered person (e.g., officers, directors) of a company to the financial community and security holders. The intent behind Regulation FD is to ensure that securities analysts and selected institutional investors are not able to make a profit or avoid a loss at the expense of those who did not have

10



**SETON & ASSOCIATES**

A LAW CORPORATION

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile: (219) 947-4948 info@setonlawgroup.com
www.setonandassociates.com

access to the same information. In addition, the rules are intended to help bring about the transparency and fairness of the dissemination of information. There is no justification for the selective dissemination of material nonpublic information on an isolated basis to a few of the ZOA's largest contributors. Akin to the public company context, transparency and fairness of the dissemination of information is consistent with the ZOA's objectives and purposes reflected in Article II(f) of the Constitution: "To foster and encourage among its members an abiding appreciation for the democratic way of life in the United States of America and the ideals upon which it is grounded."

> E.     Can the Board and the individual members defend against a claim made by donors by alleging that it/they "reasonably relied" upon the National President and therefore the Board acted in good faith? In turn, is the National President justified in relying on the ZOA's independent accountants? Are any protections set forth by Federal and state law conferred on volunteer Board members?

Unless an officer or director has knowledge that makes reliance unwarranted, an officer or director, in performing his or her duties to the organization, may rely on (written or oral) information, opinions, reports or statements, including financial statement and other financial data, if prepared or presented by: (i) one or more officers or employees of the nonprofit whom the officer or director believes in good faith to be reliable and competent in the matters presented; (ii) legal counsel, public accountants, or other persons as to matters which the officer or director believes in good faith to be within the person's professional or expert competence; or (iii) in the case of reliance by directors, a committee of the board on which the director does not serve if the director believes in good faith that the committee merits confidence. This reliance provision is codified by New York law in Section 717(b) of the NPCL which provides in its entirety as follows:



SETON & ASSOCIATES

A LAW CORPORATION

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4948 Info@setonlawgroup.com
www.setonandassociates.com

"§ 717. Duty of directors and officers.

...

(b) In discharging their duties, directors and officers, when acting in good faith, may rely on information, opinions, reports or statements including financial statements and other financial data, in each case prepared or presented by: (1) one or more officers or employees of the corporation, whom the director believes to be reliable and competent in the matters presented, (2) counsel, public accountants or other persons as to matters which the directors or officers believe to be within such person's professional or expert competence or (3) a committee of the board upon which they do not serve, duly designated in accordance with a provision of the certificate of incorporation or the bylaws, as to matters within its designated authority, which committee the directors or officers believe to merit confidence, so long as in so relying they shall be acting in good faith and with that degree of care specified in paragraph (a) of this section. Persons shall not be considered to be acting in good faith if they have knowledge concerning the matter in question that would cause such reliance to be unwarranted. Persons who so perform their duties shall have no liability by reason of being or having been directors or officers of the corporation."

It is axiomatic in our opinion that the stigma associated with the loss of tax-exempt status by the ZOA was a sufficiently compelling reason for the National President to conceal and/or discourage discussion of his own negligence in failing to manage the ZOA independent accountant relationship and allowing the ZOA to fail to file its tax returns for three consecutive years. As indicated in Clause (xiv) of Facts above, we understand that the National President has expressed his beliefs: (1) that the ZOA's accounting firm, Loeb & Troper, LLP, alone, which was hired to prepare the IRS Form 990s, has sole responsibility for the ZOA's loss of its tax-exempt status; (2) the decision to utilize the FJC to act as the recipient of charitable funds received from donors of ZOA during the loss of its tax-exempt status is sufficient to protect ZOA donors from disqualification of their charitable contributions after the Revocation Date; and (3) there is no need to notify ZOA donors as to the loss of ZOA's tax-exempt status. The National Director knew about the loss of tax-exempt status and failed to promptly convey that information to the Board.

As indicated in the statutory language above, [p]ersons shall not be considered to be acting in good faith if they have knowledge concerning the matter in question that would cause such reliance to be unwarranted. In our opinion, a disgruntled donor likely has a strong position that the individual Board members should not have relied on the assurances of the National President in acquiescing not to disclose the ZOA's loss of tax-exempt status in light of the National President's inherent conflict of interest and reason to conceal or minimize his own

12



**SETON & ASSOCIATES**

A LAW CORPORATION

8720 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4948 info@setonlawgroup.com
www.setonandassociates.com

negligence in allowing the organization to fail to file its tax returns for three consecutive years. The National President has served in such capacity for approximately 18 years. During that tenure, IRS Form 990s presumably were filed on a routine basis. To now claim that the failure to file was solely due to the fault of the ZOA's outside accountants is disingenuous at best and more likely obtuse. Where were the internal controls re the ZOA's compliance with its financial and tax reporting requirements? Under the circumstances, the National President's beliefs that the failure to file tax returns for three consecutive years was entirely the fault of the ZOA's outside accountants, that the workaround with the PJC is sound business practices, and that the ZOA need not disclose the loss of its tax-exempt status to its donors, are unwarranted and the individual Board members cannot rely upon those statements. Deference to the National President in light of his inherent conflicts and self-interest should be reduced to a minimum. Failure to ensure that the ZOA operates according to law and its governing framework is an abdication of the Board's exercise of objective and independent judgment. The National President certainly should have known that the returns were not filed for three consecutive years, and his inattention is tantamount to negligence in allowing that failure to occur. The Board cannot reasonably defer to the National President's representations and recommendations when the source of those representations is so obviously self-interested. Under these circumstances, it is our opinion that a donor likely may state a strong claim that the individual Board members did not act in good faith if they continue to rubber stamp actions requested by the National President and defer to the National President without conducting an independent investigation and demanding regular reporting of such risks facing the ZOA.

*Protections for the ZOA Board Members:*

In the interest of encouraging qualified individuals to serve on the boards of nonprofit corporations, the law has developed a variety of devices to help insulate board members from most kinds of liability.

(i)     The Federal Volunteer Protection Act of 1997 and New York State Law

On June 18, 1997, Congress passed the Volunteer Protection Act of 1997[2] (the "Volunteer Act"). The purpose of the Volunteer Act is to limit lawsuits against volunteers serving nonprofit public and private organizations and governmental agencies. Unfortunately, like similar statutes at the state level, many knowledgeable observers believe it has not achieved this goal.

---

[2] See, 42 U.S.C. § 14501, et seq.



**SETON & ASSOCIATES**

A LAW CORPORATION

8733 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4918 info@setonlawgroup.com
www.setonandassociates.com

The Volunteer Act and New York law[3] both limit the personal liability of uncompensated directors and officers who acted in good faith and in the best interests of their non-profit organizations, and generally provides that if a volunteer meets certain criteria, that is a complete defense to an action and there is no liability. If the volunteer does not meet those criteria, he or she may still have some protection from liability, as long as the volunteer has not engaged in specific types of prohibited conduct (i.e., grossly negligent acts and tortuous conduct). This protection limits the imposition of punitive damages and limits the recovery from a volunteer of non-economic damages, but probably does not limit the liability of volunteers for economic damages. The Volunteer Act does not prohibit lawsuits against volunteers, but only provides a defense if and when a lawsuit is filed. The Volunteer Act generally pre-empts conflicting state laws, applying to all volunteers unless a state passes a statute specifically eliminating the applicability of the Volunteer Act to its citizens. State laws more protective of volunteers are not pre-empted. The Volunteer Act does not apply to an action brought by the organization against the volunteer, nor does it limit the liability of the organization itself, to the extent it would otherwise be responsible for the act of the volunteer.

The problem with the Volunteer Act approach is that, where suits are not altogether prohibited, plaintiffs' counsel can usually frame the complaint to come within the circumstances in which suits are permitted. Then, even if a volunteer is ultimately absolved of all liability under the statute, that occurs only after going through at least some litigation, at often substantial cost to the volunteer's peace of mind and pocketbook.

A volunteer, for purposes of the Volunteer Act, is anyone who (a) performs services (including officers, directors, trustees, and direct service volunteers) (b) for a nonprofit organization or governmental entity, and (c) receives no compensation (although reasonable

---

[3] NPCL Section 720-a which provides in its entirety as follows:

§ 720-a. Liability of directors, officers and trustees.

Except as provided in sections seven hundred nineteen and seven hundred twenty of this chapter, and except any action or proceeding brought by the attorney general or, in the case of a charitable trust, an action or proceeding against a trustee brought by a beneficiary of such trust, no person serving without compensation as a director, officer or trustee of a corporation, association, organization or trust described in section 501 (c) (3) of the United States internal revenue code shall be liable to any person other than such corporation, association, organization or trust based solely on his or her conduct in the execution of such office unless the conduct of such director, officer or trustee with respect to the person asserting liability constituted gross negligence or was intended to cause the resulting harm to the person asserting such liability. For purposes of this section, such a director, officer or trustee shall not be considered compensated solely by reason of payment of his or her actual expenses incurred in attending meetings or otherwise in the execution of such office.



**SETON & ASSOCIATES**

A LAW CORPORATION

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile: (213) 947-4948 info@setonlawgroup.com
www.setonandassociates.com

reimbursement for expenses incurred is allowed, and (d) does not receive anything of value in excess of $500 per year, in lieu of compensation. Accordingly, since all of the Board members other than the National Director provide services without compensation to the ZOA, all except for the National Director would be protected from liability (with the relevant exclusions) under both the Volunteer Act and New York state law.

In short, the intention of the Volunteer Act is admirable, but its language is flawed, and is unlikely to provide significant protection to volunteers. It will not shield many volunteers from having to defend a lawsuit, even if the Volunteer Act ultimately protects them from judgment.

(ii)     Indemnification Protections

A board member's standard of care and applicable limits on liability are generally governed by the corporate code of the state of incorporation. The NPCL authorizes New York nonprofit corporations to indemnify their officers and directors against costs and damages from lawsuits arising from their actions taken in the scope of their duties, provided that their conduct was not willful or reckless. The NPCL requires a finding by the Board that the individual Board member or officer satisfied enumerated standards of conduct. Nonprofit corporations frequently incorporate the statutory indemnification powers in their certificate of incorporation or by-laws. As indicated previously, we have not had an opportunity to review the ZOA certificate of incorporation and, accordingly, our comments remain subject to further review of that document.

The NPCL also recognizes a corporation's authority to provide indemnification beyond that specifically authorized by statute, which is frequently accomplished by contract. The advantage of a contract, in addition to the increased scope of coverage, is that the scope of coverage cannot be decreased or altered by a change in the law, certificate of incorporation, or by-laws. We have not had an opportunity to review any ZOA contracts, including any agreement with the National President and, accordingly our comments remain subject to further review of those documents. The Constitution is silent with respect to any indemnification provisions so that document does not limit the personal liability of the directors and officers.

(iii)    Directors' and Officers' ("D&O") Insurance Coverage

The risk of exposure to personal liability may be reduced or eliminated through D&O insurance policies. Under NPCL Section 726, nonprofit corporations are granted the power to purchase and maintain insurance to indemnify their directors and officers if they acted in good faith. If the ZOA maintains such D&O insurance coverage, the terms of that policy should be analyzed to determine whether it grants the ZOA's directors and officers additional protection from personal liability.

15



**SETON & ASSOCIATES**
A LAW CORPORATION

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4948 Info@setonlawgroup.com
www.setonandassociates.com

C.      Procedures to Request Retroactive Reinstatement of Tax Exempt Status; Is
the ZOA likely to receive retroactive reinstatement from the IRS to the
Revocation Date (May 15, 2011)?

The IRS has set forth in Notice 2011-44 the parameters for organizations larger than
$50,000 in gross annual revenues to request "retroactive reinstatement." Although the grant by
the IRS of retroactive reinstatement to the Revocation Date (May 15, 2011) is theoretically
possible, it is by no means guaranteed. Several facts make it difficult for the ZOA to show "good
cause" for its failure to file its IRS Form 990 tax returns for three consecutive years. First, it is a
substantial organization that has been in existence for many years and should have been familiar
with the rules. Second, its National President is experienced (e.g., 18 years in that officer
position), very highly compensated, and should have ensured that internal controls were
established and followed to maintain ZOA in compliance. Third, arguing that it was the fault of
the ZOA independent accountant, Loeb & Troper, LLP, alone, belies the experience and
sophistication criteria of the National President. Fourth, not just one but three deadlines were
missed; the failure to file tax returns for three consecutive years was a substantial failure that
demonstrates material weakness in ZOA management and ineffective and a lack of independent
supervision by the Board. In our experience, if there is no sacrificial lamb (for example, the
replacement of the ZOA National President and/or Chief Financial Officer/Chief Accounting
Officer), it will be difficult for the ZOA to demonstrate that it has corrected the reason for its
failure to abide by the law.

It has been more than five months since the ZOA received the IRS Notice informing the
ZOA of the loss of its tax exempt status effective May 15, 2011, and yet the ZOA has not filed
its delinquent returns or its application for reinstatement as a tax-exempt organization. Once it
does, and assuming the application is ultimately granted, the ZOA's tax exemption will only
become effective as of the date of reinstatement acceptance (the "Reinstatement Date"). During
the "gap" period between the Revocation Date (May 15, 2011) and the Reinstatement Date, the
ZOA will not be exempt and all distributions to it will not be allowed. The only procedure to
eliminate that gap will be if the IRS approves the ZOA's reinstatement retroactively to the
Revocation Date. If the gap remains, the ZOA will be required to file IRS Form 1120 for the
applicable tax reporting and information periods.

To reinstate its tax-exempt status, the ZOA must promptly file a new IRS Form 1023
("Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue
Code"), pay an $850 application fee, and file the delinquent IRS Form 990s for each of the three
years.[4] To assist the IRS in processing the application, the IRS Form 1023 should have the
phrase "automatically revoked" written at the top of the application form and on the envelope in
which it is submitted to the IRS.

_____

[4] http://www.irs.gov/pub/irs-drop/n-11-44.pdf.

16



A LAW CORPORATION

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-1923 Facsimile (213) 947-4948 info@setonlawgroup.com
www.setonandassociates.com

The ZOA should attach a letter to its application which requests that the reinstatement of its tax-exempt status be retroactive, extending back to the Revocation Date. The letter must explain why the ZOA failed to file the IRS Form 990s for three consecutive years pursuant to Section 5(0.1) of IRS Notice 2011-44 including:

- A written statement setting forth all of the facts that support the ZOA's claim for reasonable cause for failing to file an IRS Form 990 in each of the three consecutive years and over the entire consecutive three-year period, including a detailed description of all the facts and circumstances that led to each failure and the continuous failure, the discovery of the failures, and the steps taken to avoid or mitigate the failures;

- A written statement describing the safeguards the organization has put into place to ensure that the organization will not fail to file returns or notices in the future;

- Evidence to substantiate all material aspects of these written statements;

- Properly completed and executed IRS Form 990s for all taxable years during and after the consecutive three-year period that the ZOA failed to file them;

  An original declaration, dated and signed under penalties of perjury by an officer, director, trustee, or other official who is authorized to sign for the organization. The form of the declaration is set forth in Section 5(.01)(6) of IRS Notice 2011-44.

The IRS will only grant the request for retroactive reinstatement if it determines that the ZOA had "reasonable cause" for missing IRS Form 990 filing deadlines for each of the three years and also for failing to file the IRS Form 990s at any time during the three-year period. While the ZOA relied on the independent accountants, Loeb and Troper, LLP, to file the IRS Form 990s, the ZOA should address whether the National President and other executives bear responsibility for ensuring that completed IRS Form 990s are timely filed. In light of the National President's experience and high compensation, the IRS may well conclude that he bears much of the responsibility for the failure to comply with the law. Ultimately, the ZOA must provide evidence that it exercised ordinary business care and prudence in determining and attempting to comply with its reporting requirements for each of the three years and over the entire three-year period, but was nevertheless unable to file them for three consecutive years. The ZOA also will be required to demonstrate that it has taken corrective action, including possible changes in management, and established and implemented policies to ensure that the failure will not reoccur and that the ZOA will otherwise operate in conformity with the law.

17



SETON & ASSOCIATES
*A LAW CORPORATION*

8730 Wilshire Boulevard, Suite 400, Beverly Hills, California 90211
Telephone: (310) 557-3923 Facsimile (213) 947-4948 info@setonlawgroup.com
www.setonandassociates.com

According to Section 5(0.3) of IRS Notice 2011-44, the IRS will not consider the ZOA's request for retroactive reinstatement unless it is submitted, together with a properly completed and executed application for reinstatement of its tax-exempt status, within 15 months of the later of the date of the IRS Notice or the date on which the IRS posts the name of the organization on the List available on the IRS website (or otherwise provides notice of the revocation to the public). The 15-month drop-dead deadline appears to be July 2013.

# EXHIBIT C



<u>MEMO</u>

To:     Michael Goldblatt
        David Drimer
        Steve Goldberg

Date:   September 5, 2012

Re:     <u>Urgent Ethical Concern</u>

Dear Michael, Dave, and Steve:

It is with reluctance and trepidation that I write this e-mail to you, but I believe I have been
placed in a position of having no other choice. I was hoping that I could just do my job at the
ZOA without being involved in any internal disagreements about ZOA governance and
compliance issues. I fear, however, that I am being threatened with punishment because of the
issues Steve has raised. Here is what happened.

This morning I received a disturbing phone call from Mort in which he demanded that I not
disclose to anyone else, presumably the National Executive Director and members of the
National Board, the substance of what he and I discuss. I find this disturbing since the issues he
brings up, both now and before his surgery, most often do not relate to Israel and my workload
but to details about political infighting at the Board level and to disparaging Steve Goldberg,
who is one of my supervisors. I do not feel comfortable being ordered to conceal from board
members and senior employees issues that relate to ethics and legality of the ZOA, which include
threats against my job, even though I really love my job and believe I'm doing important work
for the ZOA, and by extension, Israel and the Jewish people.

Mort reiterated several times that he is the President and pays my salary, implying that he could
therefore fire me at will if I do something that does not please him or is perceived as being
disloyal to him. He suggested that if I repeat any of this information to others, I will be fired.
However, my commitment to Israel and to the Zionist principles we hold dear have not been
questioned; in fact, he praised my commitment to our positions and suggested that I could grow
with the organization. The implication is that I could advance if I'm loyal to him personally,
which he equates with the ZOA. He explicitly said that any perceived lack of disloyalty to him
would be cause for termination.

The crux of the issues that he complains about relate to Steve's exposing the matter of the tax
exempt status to the entire board. He has mentioned to me several times that we must remain
secretive about the tax exempt status issue. I'm not in a position to offer any thoughts on the

legality of this matter and what is required, and it is not my place to take sides in this issue. However, as a fundraiser, I would like to make sure I'm 100% in compliance if I'm not up front about our tax status. Nor do I feel comfortable being ordered to keep our conversations secret because he has repeatedly scolded me for things that I did not do wrong; he has repeatedly threatened to fire me if I don't raise more money (and now if I don't keep our conversations confidential); and he has repeatedly expressed his dissatisfaction with the Los Angeles chapter for causing him aggravation and trouble. He continues to express his dissatisfaction with Steve for "attacking" him and also expressly blames Steve for his heart problem, which puts me in an uncomfortable position. He said Steve's harming the ZOA with his pursuit of the tax exempt issue and that, by extension, he's harming me. The logic is that Mort, not the ZOA Board, is responsible for my employment because Mort "pays my salary."

I love the ZOA because the ZOA bases its positions on principle and conscience, so I feel compelled to express that I cannot in good conscience be asked to hide information that I feel affects the ethical and also legal operations of the ZOA. I hope that this matter could be addressed without undue stress to Mort whom I know is still recovering from surgery.

I never wanted to be a whistleblower. I just wanted to do my job, and I still do.

Yours truly,

Orit Arfa
Executive Director, ZOA Western Region

EXHIBIT D

MEMO

To:    David Drimer
CC:    Michael Goldblatt, Chairman
       Susan Tuchman, Director, ZQA Center for Law & Justice

Date:  September 2, 2012

Re:    Response to your memo of 9/27/2012

Dear Dave:

Thank you for your memo dated 9/27/2012. This matter has been very stressful, and I am just
trying to do my job as best I can.

However, my concern that Mort would like to "punish" me for Steve's raising possible problems
relating to disclosure of the tax exempt status issue to potential donors is based on very specific
things Mort has said to me. Up until that point my service to the organization had been highly
praised. I believe that he requested that I keep conversations confidential because he saw me as a
whistleblower.

For example, Mort made the following statements over the course of several conversations:

1.   Although Mort asserted that we have no affirmative duty to disclose the loss of the tax-
exempt status, he was still outraged that Steve Goldberg was sending e-mails to the Board
regarding this matter. He expressed worry on more than one occasion that the matter of ZQA
losing its non-profit status was going to get "leaked." He said the matter of the loss must be kept
quiet. He said, in pursing the matter, Steve Goldberg was tainting the image of the LA chapter in
the eyes of the National Board.

2.   He discussed that closing the LA chapter would be in direct response (i.e., retaliation) for the
"trouble" Steve Goldberg was causing. He even cited a conversation he had with Abe Foxman of
ADL who sympathized with Mort's plight and who said he also had to close down a chapter (I
believe it was in Texas) because the board there was causing Foxman "trouble." Mort said he
could no longer fund a chapter that is causing him "aggravation."

3.   He consistently assailed Steve for his "campaign against him." He has even asked me to
intervene to get Steve to stop. He argued that since the National Board dislikes Steve, whom he
called "crazy" and "a psychopath," I would be directly affected since Steve is chair of my
chapter. He also said at some point that I would be the one who suffered from problems caused
by Steve.

4.   I have received Mort's direction several times about making fundraising a priority.
However, he brings it up almost every time he calls me, reiterating that it is a condition of my
keeping my job. I consider it a form of intimidation, especially since I don't think other
executive directors of other regions are under such pressure. For example, I was told that

Michigan does not turn any money it raises over to the national office, which still pays for the executive director there. Why would I be treated differently?

I love the ZOA and am doing my best under difficult circumstances. I am committed to trying to raise funds for the region. I'm sure you know the ZOA had a very bad reputation in Los Angeles because of all the turnover of executive directors who preceded me, as well as Mort's reputation as an abusive boss. This recent publicity about the tax situation has not helped our image or our fundraising efforts.

Still, I think I have done a very good job raising the ZOA's profile in a positive direction, coming up with innovative programs and attracting younger people to the organization as well as establishing our brand in the LA community. I am confident we can raise money if given reasonable time. I want to be judged fairly, under the same standards applied to other executive directors of the other regions, rather than singled out for internal political reasons that are none of my business and that do not interest me.

Your memo provides me with reassurance, and I appreciate your sending it. I do have some questions.

1.  You write that I report to you, which of course I understand, but also that Steve Goldberg is not one of my supervisors. Does that mean that if he asks me to arrange a local meeting of the board, I am to disregard him? Do I report to anyone at the local board? I remember early in my tenure there was an issue with Sandy Stein, and I was told that I was to report to Steve and to you, but not to Sandy. Has that changed? Do the executive directors of the other regions also not report to their boards?

2.  My understanding is that Steve is the National Vice Chairman. If he asks me a question, am I supposed to answer him? Can I share information with him about the ZOA? What if another national board member asks me a question?

3.  As I put in my memo of Sept. 5, 2012, Mort did tell me not to disclose the tax situation to actual or prospective donors. Now that the information is public, is that still the policy? What exactly am I supposed to say if asked? What exactly am I supposed to say if I am meeting with a possible donor but am not asked? Do I volunteer anything about our tax status? I want to make sure I follow ZOA's policy to the letter.

Again, I appreciate all your support. Please advise as to my questions above so I can make sure I am in compliance with the ZOA's policies and procedures.


Yours truly,


Orit Arfa
Executive Director, ZOA Western Region

# EXHIBIT E



MEMO

To:     Mort Klein, President
        Dave Drimer, National Executive Director
        Michael Goldblatt, Chairman
        Steve Goldberg, National Vice Chairman
        Susan Tuchman, Director, Center for Law and Justice

Date:   October 12, 2012

Re:     Concern soliciting donations without disclosure of tax-exempt status

Dear All,

I am sorry to write to you again regarding this matter, but it is a matter of conscience and I consider myself obligated to share my concerns with you

I am dedicated to raising funds for the ZOA; however, the recent publicity of the loss of our tax-exempt status, and negative feedback I've been receiving from potential donors, has made this task extremely difficult and fraught with potentially unethical and even illegal behavior.

Yesterday I outlined two plans I have to raise funds:

1)  A solicitation e-mail to our local list (attached)
2)  A proposal for a party at the Shangri La hotel (attached)

I received a telephone call from Mort on October 11, 2012 relating to both items.

Regarding the second item, I have been ordered to secure a major donor (a gift of at least $18,000) to honor at the event. We discussed reaching out to Sunny Sassoon, a potential contributor to the ZOA whom Mort knows personally.

Regarding the first item, i.e. a solicitation letter, I originally included mention of the tax status issue as follows:

> *Please make a tax-deductible donation to the future work of the ZOA by either going to our donation page at , or calling the ZOA LA Office. Should you have questions regarding the recently publicized matter of ZOA losing its tax exempt status and the plans for reinstatement, please don't hesitate to contact me or our National Executive Director, David Drimer at .*

I believed it was necessary to mention the loss, in this letter and in any solicitation for that matter, following significant publicity about the issue. Mort asked me in his phone call not to

mention the loss at all and to simply state that people should make the donation to "FJC – ZOA Donor Fund." He asked me to change the line to: "If you have any questions about the ZOA, please don't hesitate to call me and the National Executive Director."

He said mentioning the loss of the tax exempt status will only increase the number of people who know about it, and that not "everyone in America" knows about it, despite Steve Goldberg's insistence that every actual and potential donor has a right to know. Mort said it is not illegal to conceal the problem, despite Steve Goldberg's arguments to the contrary. He added that nothing at the ZOA has changed or has stopped happening due to the loss of our tax exempt status.

I find this disturbing on many levels. First, I believe, without a shadow of a doubt, that to conceal our tax exempt status is unethical and disingenuous. I'm not a lawyer, and I understand there are conflicting views about the legality of non-disclosure, but I'm inclined to worry it may be illegal, and I do not want to take the risk. As former Executive Director of the Century City Bar Association, I've inquired with tax counsel I know from my work there who said that, while she has not investigated this matter in depth, she believes an organization must disclose its tax status to potential donors. I do not feel comfortable engaging in any potentially illegal behavior. Would it be possible to see a letter from qualified tax counsel stating it is not illegal to conceal our status?

Mort's contention that the ZOA has carried on as usual is simply untrue. We have experienced cutbacks in funding for programming, including a cancellation of the annual dinner in New York, to conserve money at this time. Another negative consequence is the cancellation of the LA office lease, despite its very favorable terms. (This assumes that Dave's explanation for the cancellation is correct and that Steve's belief that it has been done to punish ZOA-Los Angeles for pressing disclosure is erroneous). I have received negative feedback from potential donors who have stated that the loss of the tax-exempt status is a deal-breaker for them, despite ZOA designating FJC as a holding entity. I submit to you three e-mails that prove the materiality of this information (attached):

1. Jesse Rosenblum, President of the OC Chapter, who wrote that a board member resigned when learning about the loss and who also expressed deep dissatisfaction at learning about this through the press.
2. Lew Groner, Marketing Director of the Jewish Community Foundation of Los Angeles, who wrote that the Foundation advises donors to give only to organizations with a 501c3 in good standing and that the ZOA would not apply, despite the FJC work-around.
3. Mark Tanenbaum, a potential ZOA supporter, who also wrote he would not contribute to the ZOA until the tax issue is cleared up.

It has been argued that revealing the tax problem hurts the ZOA more than it does to conceal the loss. We have seen that, indeed, we have lost potential donors because of the disclosure. It is very embarrassing that this has happened, no matter what the reasons. However, I believe it hurts

the ZOA even more to remain secretive about the issue and especially to engage in unethical and illegal behavior. It undermines our credibility as an organization dedicated to truth and etnics.

I regret that I have to keep raising this issue, but Zionism is a cause to which I am dedicating my life. I love working for the ZOA and I value my job. I want to make sure the ZOA, and by extension, Zionism, succeeds. I'm afraid my job is in jeopardy, but it is my loyalty to the ZOA which drives me to ensure the organization operates ethically and legally, even if there are short-term setbacks for being fully honest to potential donors about our tax exempt status.

Looking forward to hearing from you.

Yours truly,

Orit Arfa
Executive Director, ZOA Western Region

EXHIBIT B

COPY

1  GREGORY S. GLAZER (SBN 172197)
   ALISON M. HAMER (SBN 258281)
2  HIRSCHFELD KRAEMER LLP
   233 Wilshire Boulevard, Suite 600
3  Santa Monica, CA 90401
   Telephone: (310) 255-0705
4  Facsimile: (310) 255-0986

5  Attorneys for Defendant
   ZIONIST ORGANIZATION OF AMERICA

6

7

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

APR 12 2013

John A. Clarke, Executive Officer/Clerk
by _____ Deputy
    DAWN ALEXANDER

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF LOS ANGELES

10

11  ORIT ARFA, an individual,                Case No.  BC 503861

12              Plaintiff,                   **DEFENDANT ZIONIST ORGANIZATION
                                             OF AMERICA'S NOTICE OF DEMURRER
13  vs.                                      AND DEMURRER TO PLAINTIFF'S
                                             COMPLAINT**
14  ZIONIST ORGANIZATION OF
    AMERICA, a New York corporation;
15  MORTON KLEIN, an individual; and
    DOES 1 through 20, inclusive,            **Date:**    May 31, 2013 [Reserved]
16                                           **Time:**    8:30 a.m.
                Defendants.                  **Dept:**    55
17                                           **Judge:**   Hon. Malcolm Mackey

18                                           **Complaint Filed:**  March 25, 2013

19

20  TO PLAINTIFF AND HER ATTORNEY OF RECORD:

21       PLEASE TAKE NOTICE that on May 23, 2013 at 8:30 a.m., or as soon thereafter as the

22  matter may be heard in Department 55 of the above captioned court, located at 111 N. Hill Street,

23  Los Angeles, California, Defendant ZIONIST ORGANIZATION OF AMERICA (hereinafter

24  "the ZOA") will and hereby demur to the Complaint filed by Plaintiff ORIT ARFA (hereinafter

25  "Plaintiff"). This Demurrer is made pursuant to California Code of Civil Procedure section

26  430.10(e) on the grounds that Plaintiff's Wrongful Termination – Violation of Public Policy,

27  Wrongful Termination – Gender Discrimination, Conspiracy, Intentional Infliction of Emotional

28

DEF'S NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT
CASE NO. BC 503861                                          4841-1873-5891

1   Distress, Negligent Infliction of Emotional Distress, and Unfair Business Practices causes of

2   action against ZOA fail to state facts sufficient to constitute a cause of action.

3          This Demurrer is based on this Notice, the accompanying Demurrer, the Memorandum of

4   Points and Authorities, all matters of which this Court may take judicial notice, the pleadings and

5   other papers on file in this action, and such further evidence and arguments as may be presented

6   before the Court at the hearing on this Demurrer.

7

8   Dated: April 12, 2013                          HIRSCHFELD KRAEMER LLP

9

10                                      By:_____

11                                            Gregory S. Glazer
                                              Alison M. Hamer
12                                      Attorneys for Defendant
                                        ZIONIST ORGANIZATION OF AMERICA
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              2

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

# DEFENDANT ZIONIST ORGANIZATION OF AMERICA'S DEMURRER TO PLAINTIFF'S COMPLAINT

Defendant ZIONIST ORGANIZATION OF AMERICA (hereinafter "the ZOA") demurrers to the Complaint filed by Plaintiff ORIT ARFA (hereinafter "Plaintiff") on each of the following grounds set forth below.

### The ZOA's Demurrer to the First Cause of Action

1.     The First Cause of Action for Wrongful Termination – Violation of Public Policy fails to state facts sufficient to state a cause of action against the ZOA.  Code Civ. Proc. § 430.10(e).

### The ZOA's Demurrer to the Second Cause of Action

2.     The Second Cause of Action for Wrongful Termination – Gender Discrimination fails to state facts sufficient to state a cause of action against the ZOA.  Code Civ. Proc. § 430.10(e).

### The ZOA's Demurrer to the Third Cause of Action

3.     The Third Cause of Action for Conspiracy fails to state facts sufficient to state a cause of action against the ZOA.  Code Civ. Proc. § 430.10(e).

### The ZOA's Demurrer to the Fourth Cause of Action

4.     The Fourth Cause of Action for Intentional Infliction of Emotional Distress fails to state facts sufficient to state a cause of action against the ZOA.  Code Civ. Proc. § 430.10(e).

### The ZOA's Demurrer to the Fifth Cause of Action

5.     The Fifth Cause of Action for Negligent Infliction of Emotional Distress fails to state facts sufficient to state a cause of action against the ZOA.  Code Civ. Proc. § 430.10(e).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

## The ZOA's Demurrer to the Sixth Cause of Action

6.     The Sixth Cause of Action for Unfair Business Practice fails to state facts sufficient to state a cause of action against the ZOA.  Code Civ. Proc. § 430.10(e).

Dated: April 12, 2013                                        HIRSCHFELD KRAEMER LLP

By: _____

Gregory S. Glazer
Alison M. Hamer
Attorneys for Defendant
ZIONIST ORGANIZATION OF AMERICA

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This lawsuit arises out of Plaintiff Orit Arfa's ("Plaintiff") former employment with the Zionist Organization of America ("the ZOA"). The ZOA is a non-profit organization dedicated to promoting U.S.-Israel relations via educational activities and public affairs programs throughout its chapters across the United States. From October 24, 2011 until November 19, 2012, Plaintiff served as the ZOA's Western Region Executive Director in Los Angeles. (Plaintiff's Complaint ("Compl.") ¶¶ 5, 10, 16, 33-34.) Throughout 2012, the ZOA's National President, Morton Klein, directed Plaintiff to fulfill her fundraising duties on behalf of the ZOA. (Compl. ¶¶ 6, 18, 24, 26.) Without stating how, Plaintiff alleges that in asking her to perform her duties, Mr. Klein was harassing. (Compl. ¶¶ 6, 18, 24, 26.) During the two months preceding her termination, the ZOA's National Executive Director, David Drimer, spoke with Plaintiff regarding whether or not the ZOA intended to extend its lease for the Western Region's office in Los Angeles. (Compl. ¶¶ 29, 32, 36.) Ultimately, on November 19, 2012, Mr. Drimer informed Plaintiff that the ZOA was terminating her employment due to its "business decision to close the Los Angeles office and relocate the office of the Western Region to Oakland." (Compl. ¶¶ 14, 34, 36.)

Plaintiff's Complaint alleges six causes of action against the ZOA and Mr. Klein:[1] (1) tortious wrongful termination – violation of public policy; (2) tortious wrongful termination – gender discrimination; (3) tortious conspiracy to terminate Plaintiff's employment; (4) tortious intentional infliction of emotional distress; (5) tortious negligent infliction of emotional distress; and (6) unfair business practices. The crux of Plaintiff's claims is that the ZOA allegedly wrongfully terminated her employment after she complained regarding her concerns with the organization's tax exempt status. (Compl. p. 3-10.) However, Plaintiff does not allege which statute, rule, regulation, or constitutional provision the ZOA allegedly violated with its handling of its tax-exempt status. Nor does Plaintiff's Complaint allege sufficient facts to state claims for

---

[1] Plaintiff has not served the Summons and Complaint on Mr. Klein. Therefore, even though Plaintiff's claims cannot be sustained as a matter of law against Mr. Klein because he was not her employer, this Demurrer is only filed on behalf of the ZOA.

1

DEF'S NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT
CASE NO. BC 503861

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

1     gender discrimination, civil conspiracy, intentional infliction of emotional distress, negligent

2     infliction of emotional distress, or unfair business practices. Accordingly, the Court should

3     sustain the ZOA's Demurrer to all six causes of action against it.

4     **II.     LEGAL ARGUMENT**

5
6       **A.    PLAINTIFF'S WRONGFUL TERMINATION – VIOLATION OF PUBLIC POLICY CLAIM FAILS BECAUSE PLAINTIFF DOES NOT CITE WHAT UNDERLYING STATUTE THE ZOA MAY HAVE VIOLATED**

7       Plaintiff's Wrongful Termination – Violation of Public Policy Cause of Action alleges

8     that the ZOA terminated her employment because she "oppos[ed ] illegal conduct, namely, the

9     concealing of the loss of Defendant the ZOA's tax-exempt status as a not-for-profit entity."

10     (Compl. ¶ 38.) She alleges that her termination violated California Labor Code section 1102.5,

11     which prohibits an employer from "retaliate[ing] against an employee for refusing to participate

12     in an activity that would result in a violation of state or federal statute, or a violation or

13     noncompliance with a state or federal rule or regulation."

14       The California Supreme Court recognized a tort action for retaliatory or wrongful

15     termination in violation of public policy in *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167

16     (1980), (commonly referred to as a *Tameny* claim). To prevail on a *Tameny* claim, Plaintiff must

17     prove "that h[er] dismissal violated a policy that is[:] (1) fundamental[;] (2) beneficial for the

18     public[;] and (3) embodied in a statute or constitutional provision." *Turner v. Anheuser-Busch,*

19     *Inc.*, 7 Cal. 4th 1238, 1256 (1994) (internal footnotes omitted). A *Tameny* wrongful termination

20     claim arises when a plaintiff is terminated for one of the following four reasons: (1) refusal to

21     violate a statute; (2) performing an obligation imposed by the state; (3) exercising a statutory

22     privilege or right; or (4) reporting an alleged violation of a statute of public importance. *Tameny,*

23     27 Cal. 3d at 176-77. The "plaintiff [bears] . . . the burden to provide the specific statutes and

24     regulations on which he base[s] his claim" for wrongful or retaliatory termination. *Green v.*

25     *Ralee Engineering Co.*, 19 Cal. 4th 66, 84 (1998). A plaintiff's vague charge of legal "violations,

26     unaccompanied by citations to specific statutory or constitutional provisions, puts [the defendant]

27     and the court in the position of having to guess at the nature of the public policies involved, if

28     any." *Turner, supra*, 7 Cal. 4th at 1257.

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

2

1   Here, Plaintiff's Complaint fails to cite to any specific state or federal statute, rule,

2   regulation or constitutional provision on which Plaintiff bases her wrongful termination claim.

3   Thus, Plaintiff's Complaint fails to plead the requisite elements of a *Tameny* retaliatory

4   termination cause of action because it does not state what fundamental public policy Defendant

5   violated by terminating her employment.  Plaintiff's vague allegation that Defendant terminated

6   her for complaining about "concealing the loss of Defendant ZOA's tax-exempt status as a not-

7   for-profit entity" is insufficient to put Defendant and the Court on notice of which public policy

8   Plaintiff claims Defendant violated, if any, and therefore fails to state a claim for Wrongful

9   Termination in Violation of Public Policy.  *See Turner, supra*, 7 Cal. 4th at 1257 (Plaintiff's

10  "failure to identify a statutory or constitutional policy that would be thwarted by his alleged

11  discharge dooms his [wrongful termination] cause of action.").  The Court should therefore

12  sustain the ZOA's Demurrer to the Plaintiff's Wrongful Termination – Violation of Public Policy

13  Cause of Action.

14      **B.**    **PLAINTIFF'S SECOND CAUSE OF ACTION FOR WRONGFUL**

15          **TERMINATION – GENDER DISCRIMINATION FAILS BECAUSE**
        **PLAINTIFF PLED INSUFFICIENT FACTS TO ALLEGE THE ZOA**
        **TERMINATED HER BECAUSE OF HER GENDER**

16

17      To state a claim for wrongful termination in violation of public policy, Plaintiff must

18  allege that: (1) she was terminated from her employment; (2) the termination was a violation of

19  public policy, i.e., there was a nexus between the termination and her gender; and (3) she suffered

20  damages.  *See Turner, supra*, 7 Cal. 4th at 1258-59.

21      Plaintiff does not allege *any* facts regarding gender discrimination within the ten pages of

22  her Complaint's Factual Background.  (*See* Compl. pp. 1-10.)  Rather, she bases her entire

23  Second Cause of Action for Wrongful Termination – Gender Discrimination on a single

24  allegation:  that "other directors who were all male . . . were not required to fund-raise anywhere

25  near the rate at which [she] was."  (Compl. ¶ 44.)  Plaintiff then concludes that she was

26  "terminated because she was a woman." (Compl. ¶ 45-46.)  These are two independent

27

28

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

3

DEF'S NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT
CASE NO. BC 503861

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

1  conclusions; Plaintiff fails to allege any facts to state a causal nexus between the level of

2  fundraising she was required to perform, her gender, and termination.[2]

3         Plaintiff's bare legal conclusion is insufficient to state a cause of action for wrongful

4  termination based upon gender. A "bare legal conclusion" cannot suffice where factual pleading

5  is required. *See McAllister v. County of Monterey*, 147 Cal. App. 4th 253, 289 (2007) (finding

6  that the court must "take as true the well-pleaded factual allegations of the complaint . . . [but]

7  may not consider conclusions of fact or law, opinions, speculation or allegations which are

8  contrary either to law or to judicially noticed facts"); *see also Faulkner v. California Toll Bridge*

9  *Authority*, 40 Cal. 2d 317, 330 (1953) (finding that "plaintiffs, to state a cause of action

10  warranting judicial interference with the official acts of defendants, must allege much more than

11  mere conclusions of law; they must aver the specific facts from which the conclusions entitling

12  them to relief would follow"). Since Plaintiff failed to plead sufficient facts of a causal nexus

13  between her gender and termination, the Court should sustain the ZOA's Demurrer to her

14  Wrongful Termination – Gender Discrimination Cause of Action.

15  **C.**     **PLAINTIFF'S THIRD CAUSE OF ACTION FOR CIVIL CONSPIRACY**
               **FAILS AS A MATTER OF LAW BECAUSE ZOA CANNOT CONSPIRE**
16                 **WITH ITSELF VIA ITS NATIONAL PRESIDENT**

17         Plaintiff's Civil Conspiracy Cause of Action against the ZOA fails because it is well

18  established that a corporation cannot conspire with itself through the actions of its agents.

19  Plaintiff alleges that the ZOA and its National President, Mr. Klein, agreed, intended, and planned

20  to terminate her because of her concerns over the tax issue and because she was a woman, which

21  resulted in her termination and related damages. (Compl. ¶¶ 50, 51, 52, 53.) "A conspiracy

22  generally requires agreement plus an overt act causing damage." *Janken v. GM Hughes*

23  *Electronics*, 46 Cal. App. 4th 55, 78 (1996) (*citing Doctors' Co. v. Superior Court*, 49 Cal. 3d 39,

24  44 (1989)). In *Janken*, the court explained that a corporation cannot be held liable for civil

25  conspiracy through the acts of its agents:

26         A corporate employee cannot conspire with his or her corporate employer; that

27   

---

[2] In fact, Plaintiff does not allege that ZOA terminated her employment for her fundraising
28  performance.

4

DEF'S NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT
CASE NO. BC 503861

1  would be tantamount to a person conspiring with himself. Thus, when a corporate
employee acts in his or her authorized capacity on behalf of his or her corporate
2  employer, there can be no claim of conspiracy between the corporate employer
and the corporate employee. In such a circumstance, the element of concert is
3  missing.

4  *Id.* (internal citations omitted.)

5       Plaintiff essentially pled that the ZOA wrongfully terminated her employment through

6  agreement with Mr. Klein, and she is attempting to hold the ZOA and Mr. Klein mutually liable

7  by alleging a non-cognizable civil conspiracy claim between the two of them, even though

8  individual, non-employers cannot be held personally liable for discrimination or wrongful

9  termination by engaging in personnel actions on behalf of their employer. *See id.* at 80; *see also*

10  *Weinbaum v. Goldfarb, Whitman & Cohen*, 46 Cal. App. 4th 1310, 1315 (1996). Based on the

11  foregoing, Plaintiff's Civil Conspiracy cause of action fails.

12      **D.**    **PLAINTIFF'S FOURTH CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS FAILS BECAUSE PLAINTIFF**
13          **DID NOT SUFFICIENTLY PLEAD ZOA ENGAGED IN EXTREME OR OUTRAGEOUS CONDUCT**

14

15       To satisfy a cause of action for IIED, Plaintiff must plead the following: "(1) extreme and

16  outrageous conduct by the defendant with the intention of causing, or reckless disregard of the

17  probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme

18  emotional distress; and (3) actual and proximate causation of the emotional distress by the

19  defendant's outrageous conduct . . . ." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965,

20  1001 (1993). (citations omitted). The alleged conduct must be "so extreme as to exceed all

21  bounds [of conduct] that is usually tolerated in a civilized community." *Id.* Here, Plaintiff has

22  not alleged any facts that constitute extreme and outrageous conduct sufficient to establish that

23  the ZOA intentionally inflicted emotional distress upon her.

24       Plaintiff's allegation that the ZOA pressured her to fund-raise and terminated her

25  employment are insufficient to amount to extreme or outrageous conduct to support her IIED

26  claim. These are personnel actions, which are the *sine qua non* of any business operation.

27  *Sheppard v. Freeman*, 67 Cal. App. 4th 339, 345 (1998). "[T]o properly manage its business,

28  every employer must on occasion review, criticize, demote, and discipline employees." *Id.*

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

5

1  (*quoting Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal. 3d 148, 160 (1987)).  In addition,

2  simply terminating an employee, even if without cause, does not constitute outrageous conduct.

3  *See Buscemi v. McDonnell Douglas Corp.*, 736 F.2d 1348, 1352 (9th Cir. 1984); *Trerice v. Blue*

4  *Cross of California*, 209 Cal. App. 3d 878, 883 (1989).[3]  Because Plaintiff's Complaint does not

5  allege any facts to show the ZOA intentionally engaged in extreme and outrageous conduct

6  towards her that is "so extreme as to exceed all bounds [of conduct] that is usually tolerated in a

7  civilized community," the Court should sustain the ZOA's Demurrer to Plaintiff's Fourth Cause

8  of Action.

9        **E.**     **PLAINTIFF'S FIFTH CAUSE OF ACTION FOR NEGLIGENT**
                  **INFLICTION OF EMOTIONAL DISTRESS FAILS BECAUSE IT IS**

10           **BARRED BY THE WORKERS' COMPENSATION ACT**

11       California Labor Code section 3602(a) provides that "[w]here the conditions of

12  compensation set forth in Section 3600 concur, the right to recover such compensation is . . . the

13  sole and exclusive remedy of the employee . . . against the employer."  The California Supreme

14  Court has found that "injuries caused by employer negligence or without employer fault [ ] are

15  compensated at the normal rate under the workers' compensation system" and civil actions are

16  barred by the Workers' Compensation Act.  *Fermino v. Fedco, Inc.*, 7 Cal. 4th 701, 721-23

17  (1994).

18       In her Complaint, Plaintiff fails to allege facts that would take the claim for negligent

19  infliction of emotional distress ("NIED") out of the employment context and, therefore, beyond

20  the exclusive remedy provisions of the Workers' Compensation Act ("WCA").  *See Cole, supra*,

21  43 Cal. 3d 148.  In *Cole*, the plaintiff alleged that his employer deliberately harassed and

22  punished him.  The *Cole* court held that even this type of conduct necessarily arose in the "course

23  of the employment," within the purview of Labor Code sections 3600 *et seq. Id.* at 160.  "Actions

24  which are a normal part of the employment relationship, such as demotions, promotions, criticism

25  of work practices, and frictions in negotiations as to grievances" fall within the exclusive remedy

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

---

[3] In fact, Plaintiff alleges that ZOA "allowed her to bring her mother into the [termination] meeting for emotional support."  (Compl. ¶ 35.)  One should wonder how outrageously ZOA treated Plaintiff during her termination meeting if this allegation is true.

6

1    of the workers' compensation laws.  *Id.*; *Shoemaker v. Myers*, 52 Cal. 3d 1 (1990) (*affirming Cole*

2    and holding plaintiff's cause of action for intentional infliction of emotional distress was

3    preempted by Labor Code sections 3600 *et seq.*).  *Shoemaker* further held that characterizing the

4    employer's conduct as intentional or outrageous was not enough to escape the exclusive remedy

5    provisions of the WCA.  *Id.* at 26; *see also Livitsanos v. Superior Court*, 2 Cal. 4th 744 (1992).

6            Here, Plaintiff's claim arises solely from her employment with the ZOA.  She alleges the

7    ZOA negligently inflicted emotional distress upon her by pressuring her to perform her

8    fundraising duties and terminating her employment.  (Compl. ¶¶ 18, 19, 26, 34.)  Because

9    Plaintiff's claims fall only within the employment relationship, *Cole* and *Shoemaker's* governing

10   holdings dictate this claim is barred by the exclusive remedy provisions of the WCA.

11   **F.    PLAINTIFF'S NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
        **CLAIM ALSO FAILS BECAUSE ALL CONDUCT PLAINTIFF ALLEGED**
12      **WAS FRAMED AS INTENTIONAL CONDUCT, NOT NEGLIGENT**
        **CONDUCT**
13

14           To prove negligent infliction of emotional distress, Plaintiff must demonstrate that the

15   ZOA owed her a duty, that the ZOA engaged in negligent conduct, that she then suffered severe

16   emotional harm, and that the negligent conduct was the cause of the emotional distress suffered

17   by Plaintiff.  *See Burgess v. Superior Ct.*, 2 Cal. 4th 1064, 1072 (1992).  Plaintiff's NIED claim

18   fails because Plaintiff alleges intentional, but not negligent conduct, as the basis for her NIED

19   claim.

20           Intentional conduct cannot be used as a basis for recovery under NIED theory.  *Semore v.*

21   *Pool*, 217 Cal. App. 3d 1087, 1105 (1990).  An employer's supervisory conduct is inherently

22   intentional and customary to the employer-employee relationship.  *See id.*  Thus, an employee

23   asserting a NIED claim against her employer cannot base her suit on a supervisor's intentional

24   conduct or personnel decision by framing intentional acts as "breaching a duty" towards her.  *Id.*

25           In *Semore v. Pool*, an employee sued his former employer for wrongful termination and

26   NIED when he was terminated for refusing to submit to a work-related drug screening.  *Id.* at

27   1092-93.  The court held that the supervisor had intentionally terminated the plaintiff's

28   employment, and thus, the deliberate firing of plaintiff could not serve as a basis for a negligence

7

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

1   claim. *Id.* at 1105. Here, the ZOA's alleged conduct with relation to terminating Plaintiff's

2   employment was, of course, intentional conduct. (Compl. ¶¶ 26, 34.) Even if the Court accepts

3   all of Plaintiff's allegations as true, each instance of allegedly actionable conduct was intentional.

4   Thus, Plaintiff's Fifth Cause of Action fails as a matter of law and must be dismissed, with

5   prejudice.

6   ### G.   PLAINTIFF'S UNFAIR COMPETITION LAW CLAIM FAILS FOR THE SAME REASONS HER OTHER CLAIMS FAIL

7

8          Plaintiff failed to state a claim for violation of the UCL for the same reasons as all of her

9   other claims fail. As the California Supreme Court has recognized, the UCL "borrows" violations

10  of other laws and treats them as unlawful practices independently actionable under the UCL.

11  *Farmers Ins. Exchange v. Superior Court*, 2 Cal. 4th 377, 383 (1992); *People v. McKale*, 25 Cal.

12  3d 626, 632 (1979). Dismissal of the "borrowed" cause of action necessarily causes a dismissal

13  of the Section 17200 claim. *See, e.g., Ingels v. Westwood One Broadcasting Services, Inc.*, 129

14  Cal. App. 4th 1050, 1060 (2003) (holding that "[a] defendant cannot be liable under the UCL for

15  committing 'unlawful business practices' without having violated another law . . . If the

16  [underlying] claim is dismissed, then there is no 'unlawful' act upon which to base the derivative

17  Unfair Competition claim.").

18         By law, at best, Plaintiff's UCL claim "borrows" the violations alleged in her other causes

19  of action, to the extent that she pled sufficient facts to state any claims. Because Plaintiff failed to

20  state a claim for wrongful termination, civil conspiracy, or infliction of emotional distress, she

21  failed to state that the ZOA violated the UCL. Accordingly, the Court should sustain the ZOA's

22  Demurrer to Plaintiff's Sixth Cause of Action.

23  /// 

24  /// 

25  /// 

26  /// 

27  /// 

28  /// 

8

DEF'S NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT
CASE NO. BC 503861

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

III.   **CONCLUSION**

For the foregoing reasons, Defendant the ZOA respectfully requests that the Court sustain its Demurrer and dismiss Plaintiff's First, Second, Third, Fourth, Fifth, and Sixth Causes of Action against it.

Dated: April 12, 2013                              HIRSCHFELD KRAEMER LLP


By: _____
                                Gregory S. Glazer
                                Alison M. Hamer
                        Attorneys for Defendant
                        ZIONIST ORGANIZATION OF AMERICA

DEF'S NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT
CASE NO. BC 503861

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I, the undersigned, am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 233 Wilshire Boulevard, Suite 600, Santa Monica, California 90401. On April 12, 2013, I served the following document(s) by the method indicated below:

### DEFENDANT ZIONIST ORGANIZATION OF AMERICA'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFF'S COMPLAINT

☐ by transmitting **via facsimile** on this date from fax number (310) 255-0986 the document(s) listed above to the fax number(s) set forth below. The transmission was completed before 5:00 p.m. and was reported complete and without error. Service by fax was made by agreement of the parties, confirmed in writing. The transmitting fax machine complies with Cal. R.Ct 2003(3).

☒ by placing the document(s) listed above in a sealed envelope(s) with postage thereon fully prepaid, in the **United States mail** at Santa Monica, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited in the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ by placing the document(s) listed above in a sealed envelope(s) and by causing **messenger delivery** of the envelope(s) to the person(s) at the address(es) set forth below. I am readily familiar with the business practice of my place of employment with respect to the collection and processing of correspondence, pleadings and notices for hand delivery. On April 12, 2013, I caused to be served via messenger the above-listed documents.

☐ by **personally delivering** the document(s) listed above to the person(s) at the address(es) set forth below.

☐ by placing the document(s) listed above in a sealed envelope(s) and consigning it to an **express mail service** for guaranteed delivery on the next business day following the date of consignment to the address(es) set forth below.

Bryan C. Altman
Joel E. Elkins
The Altman Law Group
6300 Wilshire Blvd., Suite 980
Los Angeles, CA 90048
Phone: (323) 653-5581
Fax: (323) 653-5542

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on April 12, 2013, at Santa Monica, California.

*Karen C. Torres*

Karen Torres

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

EXHIBIT C

COPY

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 12 2013

John A. Clarke, Executive Officer/Clerk
By _____ Deputy
DAWN ALEXANDER

1  GREGORY S. GLAZER (SBN 172197)
   ALISON M. HAMER (SBN 258281)
2  HIRSCHFELD KRAEMER LLP
   233 Wilshire Boulevard, Suite 600
3  Santa Monica, CA 90401
   Telephone: (310) 255-0705
4  Facsimile: (310) 255-0986

5  Attorneys for Defendant
   ZIONIST ORGANIZATION OF AMERICA
6

7

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    COUNTY OF LOS ANGELES

10

11  ORIT ARFA, an individual,                Case No. BC 503861

12            Plaintiff,                      **DEFENDANT ZIONIST ORGANIZATION
                                              OF AMERICA'S NOTICE OF MOTION
13  vs.                                       AND MOTION TO STRIKE PORTIONS
                                              OF PLAINTIFF ORIT ARFA'S
14  ZIONIST ORGANIZATION OF                   COMPLAINT**
    AMERICA, a New York corporation;
15  MORTON KLEIN, an individual; and
    DOES 1 through 20, inclusive,
16                                            **Date:**    May 31, 2103 [Reserved]
              Defendants.                     **Time:**    8:30 a.m.
17                                            **Dept:**    55
                                              **Judge:**   Hon. Malcolm Mackey
18
                                              **Complaint Filed:** March 25, 2013
19

20

21  TO PLAINTIFF AND HER ATTORNEY OF RECORD:

22       PLEASE TAKE NOTICE that on May 23, 2013 at 8:30 a.m., or as soon thereafter as the

23  matter may be heard in Department 55 of the above captioned court, located at 111 N. Hill Street,

24  Los Angeles, California, Defendant ZIONIST ORGANIZATION OF AMERICA (hereinafter

25  "the ZOA") will and hereby moves this Court to strike portions of the Complaint filed by Plaintiff

26  ORIT ARFA (hereinafter "Plaintiff").

27  / / /

28

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

Specifically, Defendant the ZOA moves to strike the following portions of the Complaint:

<u>Sixth Cause of Action</u>

1.    "Plaintiff alleges that, as a direct and proximate result of Defendants' unfair business practices, Plaintiff has suffered damages, in an amount to be proven at trial." (Page 15, Paragraph 69, Lines 21-22.)

<u>Prayer for Relief</u>

2.    "statutory damages and costs, including reasonable attorneys' fees" (Page 16, Line 1.)

This Motion to Strike is made on the grounds that said text referenced above is immaterial, irrelevant, and seeks damages that are not recoverable as a matter of law in Wrongful Termination, Civil Conspiracy, Intentional and Negligent Infliction of Emotional Distress, and Unfair Business Practice causes of action. Code Civ. Proc. § 436(a). Plaintiff's Complaint fails to identify any statute under which she may recover attorneys' fees in this lawsuit. Thus, she has not stated facts to support her prayer for attorneys' fees. In addition, damages are not recoverable under California Business and Professions Code section 17200 *et seq.*

This Motion to Strike is supported by the Notice attached hereto, the Memorandum of Points and Authorities, the papers and documents on file with this Court, and any and all arguments presented to the Court at the hearing.

Dated: April 12, 2013                                HIRSCHFELD KRAEMER LLP

By: _____
                                Gregory S. Glazer
                                Alison M. Hamer
                        Attorneys for Defendant
                        ZIONIST ORGANIZATION OF AMERICA

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

2

1       ## MEMORANDUM OF POINTS AND AUTHORITIES

2  **I.     INTRODUCTION**

3          This lawsuit arises out of Plaintiff Orit Arfa's ("Plaintiff") former employment with the

4  Zionist Organization of America ("the ZOA").  Plaintiff's Complaint alleges six causes of action

5  against ZOA and Mr. Klein:[1] (1) tortious wrongful termination – violation of public policy;

6  (2) tortious wrongful termination – gender discrimination; (3) tortious conspiracy to terminate

7  Plaintiff's employment; (4) tortious intentional infliction of emotional distress; (5) tortious

8  negligent infliction of emotional distress; and (6) unfair business practices under California

9  Business and Professions Code section 17200, *et seq.*

10         This motion seeks to strike Plaintiff's improper prayer for attorneys' fees in her tort

11  Wrongful Termination, Civil Conspiracy, Intentional Infliction of Emotional Distress, Negligent

12  Infliction of Emotional Distress Causes of Action, because her prayer is unsupported by any

13  contract or statute.  In addition, the Court should strike Plaintiff's prayer for attorneys' fees in her

14  Unfair Business Practices cause of action because California Business and Professions Code

15  section 17200, *et seq.* does not provide for the recovery of attorneys' fees.  Lastly, this motion

16  seeks to strike Plaintiff's improper prayer for damages in her Unfair Business Practice Cause of

17  Action, because only injunctive and restitutionary reliefs are available under the statute.

18  **II.    LEGAL ARGUMENT**

19         **A.     MOTION TO STRIKE LEGAL STANDARD**

20         Code of Civil Procedure section 436 provides:

21         The court may, upon a motion made pursuant to section 435, or at any time in its

22  discretion, and upon terms it deems proper:

23         (a)     **Strike out any irrelevant, false, or improper** matter inserted in any
                   pleading.
24         (b)     Strike out all or any part of any pleading not drawn or filed in conformity
                   with the laws of this state, a court rule, or an order of the court. (Emphasis
25                 added.)

26

27  ---

[1] Plaintiff has not served the Summons and Complaint to Mr. Klein.  Therefore, even though
Plaintiff's claims cannot be sustained as a matter of law against Mr. Klein because he was not her
28  employer, this Motion to Strike is only filed on behalf of the ZOA.

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

1   "An immaterial allegation in a pleading [includes] . . . [a] demand for judgment requesting relief

2   not supported by the allegations of the complaint . . . ."  Code Civ. Proc. § 431.10(b)(3).

3      **B.   PLAINTIFF'S FAILURE TO ATTACH AN AGREEMENT THAT
          CONTAINS A PREVAILING PARTY ATTORNEYS' FEE PROVISION OR
4          CITE A STATUTE THAT PROVIDES FOR THE RECOVERY OF
          ATTORNEYS' FEES PRECLUDES AN AWARD OF ATTORNEYS' FEES
5          UNDER HER TORT CAUSES OF ACTION**

6         Under the American rule, as a general proposition, each party must pay its own attorneys'

7   fees.  This concept is embodied in Code of Civil Procedure section 1021, which provides that

8   **each party is to bear his or her own attorneys' fees unless a statute or agreement of the**

9   **parties provides otherwise**.  In interpreting Code of Civil Procedure section 1021, courts

10  generally rule that without a specific statutory provision or contractual agreement, attorneys' fees

11  are not part of the costs recoverable from the opposing party.  *See Jutkowitz v. Bourns, Inc.*, 118

12  Cal. App. 3d 102 (1981).  Thus, "in the absence of some statutory right or contractual provision,

13  attorney's fees are to be paid by the party employing the attorney."  *Carroll v. Hanover Ins. Co.*,

14  266 Cal. App. 2d 47, 50 (1968).

15        Plaintiff's Complaint fails to identify any contract or statute providing for recovery of

16  attorneys' fees under her tort causes of action of Wrongful Termination - Violation of Public

17  Policy, Wrongful Termination – Gender Discrimination, Civil Conspiracy, Intentional Infliction

18  of Emotional Distress, and Negligent Infliction of Emotional Distress.  Plaintiff cannot recover

19  attorneys' fees for such causes of action absent a contract or statute providing for attorneys' fees

20  for the prevailing party since they are rooted in tort.  *See* Code Civ. Pro. § 1021 (providing each

21  party is to bear his or her own attorneys' fees unless a statute or agreement of the parties provides

22  otherwise).  Nonetheless, Plaintiff's prayer for relief makes an unsupported request for "statutory

23  damages and costs, including reasonable attorneys' fees . . . ."  (Compl. p. 16, Line 1.)  Plaintiff

24  has failed to allege the basis of her request for attorneys' fees in connection with these tort causes

25  of action.  Accordingly, the Court should strike Plaintiff's prayer for attorneys' fees in her First,

26  Second, Third, Fourth, and Fifth Causes of Action.

27

28

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

2

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

**C. PLAINTIFF CANNOT RECOVER ATTORNEYS' FEES UNDER HER STATUTORY CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200 ET SEQ. CLAIM BECAUSE THE STATUTE DOES NOT PROVIDE FOR ATTORNEYS' FEES**

Similarly, Plaintiff has not cited any statute to recover attorneys' fees under her Sixth Cause of Action of Unfair Business Practices under California Business and Professions Code section 17200 *et seq.* "The unfair competition law does not provide for attorney fees, and relief is generally limited to injunctive relief and restitution." *Walker v. Countrywide Home Loans, Inc.*, 98 Cal. App. 4th 1158, 1180 (2002). Thus, the Court should strike Plaintiff's prayer for attorneys' fees in her Sixth Cause of Action.

**D. PLAINTIFF'S PRAYER FOR DAMAGES IS IMPROPER UNDER HER UNFAIR BUSINESS PRACTICES CAUSE OF ACTION BECAUSE THE STATUTE ONLY PROVIDES FOR INJUNCTIVE AND RESTITUTIONARY RELIEF**

The UCL "'borrows' violations from other laws by making them independently actionable as unfair competitive practices." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003). "A UCL action is equitable in nature; damages cannot be recovered." *Id*; *see also Heller v. Norcal Mutual Ins. Co.*, 8 Cal. 4th 30, 45 (1994) ("Damages are not available for claims under the Unfair Business Practices Act."); *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1266 (1992). Plaintiff's Complaint is seeking past and future wages, emotional distress damages, and punitive damages, which are unrecoverable under this statute. Her allegation that "as a direct and proximate result of [the ZOA's] unfair business practices,[ she] has suffered damages" requests recovery unsupported by the Unfair Business Practices Act. Therefore, the Court should strike this sentence from Plaintiff's Complaint.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

3

III.    **CONCLUSION**

For the foregoing reasons, the ZOA respectfully requests that the Court strike Plaintiff's request for attorneys' fees as to her First, Second, Third, Fourth, Fifth and Sixth causes of action, and her prayer for damages in her Sixth cause of action.

Dated: April 12, 2013                                    HIRSCHFELD KRAEMER LLP

By: _____
                                                     Gregory S. Glazer
                                                     Alison M. Hamer
                                            Attorneys for Defendant
                                            ZIONIST ORGANIZATION OF AMERICA

DEF'S NOTICE OF MOTION AND MOTION TO STRIKE
CASE NO. BC 503861

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I, the undersigned, am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 233 Wilshire Boulevard, Suite 600, Santa Monica, California 90401. On April 12, 2013, I served the following document(s) by the method indicated below:

**DEFENDANT ZIONIST ORGANIZATION OF AMERICA'S**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEMURRER TO COMPLAINT AND MOTION TO STRIKE**

☐   by transmitting **via facsimile** on this date from fax number (310) 255-0986 the document(s) listed above to the fax number(s) set forth below. The transmission was completed before 5:00 p.m. and was reported complete and without error. Service by fax was made by agreement of the parties, confirmed in writing. The transmitting fax machine complies with Cal. R.Ct 2003(3).

☒   by placing the document(s) listed above in a sealed envelope(s) with postage thereon fully prepaid, in the **United States mail** at Santa Monica, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited in the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐   by placing the document(s) listed above in a sealed envelope(s) and by causing **messenger delivery** of the envelope(s) to the person(s) at the address(es) set forth below. I am readily familiar with the business practice of my place of employment with respect to the collection and processing of correspondence, pleadings and notices for hand delivery. On April 12, 2013, I caused to be served via messenger the above-listed documents.

☐   by **personally delivering** the document(s) listed above to the person(s) at the address(es) set forth below.

☐   by placing the document(s) listed above in a sealed envelope(s) and consigning it to an **express mail service** for guaranteed delivery on the next business day following the date of consignment to the address(es) set forth below.

Bryan C. Altman
Joel E. Elkins
The Altman Law Group
6300 Wilshire Blvd., Suite 980
Los Angeles, CA 90048
Phone: (323) 653-5581
Fax: (323) 653-5542

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on April 12, 2013, at Santa Monica, California.

*Karen Torres*
_____
Karen Torres

DEF'S MEMO OF P&AS ISO DEMURRER AND MOTION TO STRIKE
CASE NO. BC 503861

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

# EXHIBIT D

1 | GREGORY S. GLAZER (SBN 172197)
ALISON M. HAMER (SBN 258281)
2 | HIRSCHFELD KRAEMER LLP
233 Wilshire Boulevard, Suite 600
3 | Santa Monica, CA  90401
Telephone:  (310) 255-0705
4 | Facsimile:  (310) 255-0986

5 | Attorneys for Defendants
ZIONIST ORGANIZATION OF AMERICA
6 | And MORTON KLEIN

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF LOS ANGELES

10

| | |
|---|---|
| 11  ORIT AFRA, an individual, | Case No.  BC 503861 |
| 12         Plaintiff, | **DEFENDANTS ZIONIST ORGANIZATION OF AMERICA AND MORTION KLEIN'S NOTICE TO STATE COURT AND TO ADVERSE PARTIES RE: REMOVAL TO U.S. DISTRICT COURT, CENTRAL DISTRICT** |
| 13  vs. | |
| 14  ZIONIST ORGANIZATION OF AMERICA, a New York corporation; | |
| 15  MORTON KLEIN, an individual; and DOES 1 through 20, inclusive, | |
| 16         Defendants. | |
| 17 | **Dept:**     55 <br> **Judge:**    Hon. Malcolm Mackey |
| 18 | **Complaint Filed:**  March 25, 2013 |

19

20        **PLEASE TAKE NOTICE** that, ZIONIST ORGANIZATION OF AMERICA and

21 | MORTON KLEIN, Defendants in the above-captioned matter, have filed a NOTICE OF

22 | REMOVAL OF ACTION TO FEDERAL COURT, pursuant to 28 U.S.C. sections 1441(a), (b)

23 | and 1446, in the United States District Court for the Central District of California, thereby

24 | removing the above-captioned matter to said court.

25 | / / /

26 | / / /

27 | / / /

28 | / / /

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

1   A copy of the Notice of Removal of Action to Federal Court is attached hereto as Exhibit 1.

2

3   Dated: April 25, 2013                          HIRSCHFELD KRAEMER LLP

4

5                                          By: _____

6                                                      Gregory S. Glazer
                                                       Alison M. Hamer
7                                          Attorneys for Defendants
                                           ZIONIST ORGANIZATION OF AMERICA
8                                          and MORTON KLEIN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

# EXHIBIT A

1   GREGORY S. GLAZER, Bar No. 172197
    gglazer@hkemploymentlaw.com
2   ALISON M. HAMER, Bar No. 258281
    ahamer@hkemploymentlaw.com
3   HIRSCHFELD KRAEMER LLP
    233 Wilshire Boulevard, Suite 600
4   Santa Monica, CA  90401
    Telephone:  (310) 255-0705
5   Facsimile:  (310) 255-0986

6   Attorneys for Defendants
    ZIONIST ORGANIZATION OF AMERICA
7   and MORTON KLEIN

8

9                     UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT - CENTRAL DISTRICT

11

12  ORIT ARFA, an individual,            Case No.

13              Plaintiff,               **[Los Angeles County Superior Court
                                         Case No.  BC503861]**
    vs.
14                                       **DEFENDANT ZIONIST
    ZIONIST ORGANIZATION OF              ORGANIZATION OF AMERICA
15  AMERICA, a New York                  AND MORTON KLEIN'S NOTICE
    corporation; MORTON KLEIN, an        OF REMOVAL TO FEDERAL
16  individual; and DOES 1 through 20,   COURT UNDER 28 U.S.C. § 1441(a);
    inclusive,                           28 U.S.C. § 1332**
17
                Defendants.              **Complaint Filed:**     March 25, 2013
18

19  TO THE CLERK OF THE COURT:

20          PLEASE TAKE NOTICE THAT pursuant to 28 U.S.C. sections 1441(a) and

21  1446, Defendants the Zionist Organization of America and Morton Klein hereby

22  remove the above-entitled action from the Superior Court of California in and for

23  the County of Los Angeles to the United States District Court for the Central

24  District of California.

25

26

27

28

DEFENDANTS' NOTICE OF REMOVAL TO FEDERAL COURT
CASE NO.                                                        4820-0330-7539

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

# GROUNDS FOR REMOVAL ON THE BASIS OF DIVERSITY

## I.      REMOVAL JURISDICTION

This Court has original jurisdiction over this action under 28 U.S.C. Section 1332 because it involves citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.  Defendants the Zionist Organization of America ("the ZOA") and Morton Klein (collectively "Defendants") are citizens of the States of New York and Pennsylvania, respectively, whereas Plaintiff Orit Arfa ("Plaintiff") is a resident and citizen of the State of California.  Plaintiff claims that she is seeking $300,000.00 in damages and attorneys' fees.

On or about March 25, 2013, Plaintiff filed a Complaint in the Superior Court of the State of California for Los Angeles, entitled *Orit Arfa, an individual, vs. Zionist Organization of America, a New York corporation; Morton Klein, an individual; and DOES 1 through 20, inclusive*, Case No. BC503861 (hereinafter the "Complaint").  (Declaration of Gregory Glazer ("Glazer Decl.") ¶ 2, Exh. A.)  The Complaint purports to state causes of action against Defendants for wrongful termination, civil conspiracy, intentional and negligent infliction of emotional distress, and unfair business practices.  (Glazer Decl. ¶ 2, Ex. A.)

The ZOA filed a Demurrer and Motion to Strike portions of Plaintiff's Complaint in state court on April 12, 2013, which has not been heard.  (Glazer Decl. ¶ 3, Exh. B & C.)  Mr. Klein was served the Summons and Complaint on April 20, 2013 and has not filed a responsive pleading because it is not yet due.  (Glazer Decl. ¶ 2.)

Pursuant to 28 U.S.C. section 1446(d), Defendants are concurrently filing a Notice to the State Court of Removal with the Superior Court of the State of California in and for the County of Los Angeles and serving it on Plaintiff.  (Glazer Decl. ¶ 4, Exh. D.)

DEFENDANTS' NOTICE OF REMOVAL TO FEDERAL COURT
CASE NO.

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

## II.     COMPLETE DIVERSITY OF CITIZENSHIP EXISTS

### A.     The Parties are Citizens of Different States

There is complete diversity of citizenship in this case between Plaintiff and Defendants the ZOA and Mr. Klein.  Complete diversity of citizenship exists when each of the plaintiff is a citizen of a different state from each of the defendants.  *See, e.g.*, *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996).  Citizenship of a natural person is determined by his or her state of domicile.  *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001).  A corporation is deemed to be a "citizen" of "any State by which it has been incorporated and of the State where it has its principal place of business."  28 U.S.C. §1332(a).

Here, the ZOA, which is a corporation, is incorporated in and has its principal place of business in the State of New York.  (Declaration of David Drimer ("Drimer Decl.") Decl. ¶ 2; Glazer Decl. ¶ 2, Exh. A ¶ 5.)  The ZOA is a citizen of New York, **not** California.

Defendant Morton Klein resides in and is a citizen of the State of Pennsylvania, and is **not** a citizen of California.  (Declaration of Morton Klein ("Klein Decl.") ¶ 2; Glazer Decl. ¶ 2, Exh. A ¶ 6.)

According to her Complaint, Plaintiff is a resident of the State of California.  (Glazer Decl. ¶ 2, Exh. A ¶ 4.)  She therefore is completely diverse from Defendants, which are not citizens of that state.

## III.    THE AMOUNT IN CONTROVERSY EXCEEDS $75,000

Under 28 U.S.C. section 1332(a), federal district courts have diversity jurisdiction over civil actions where the amount in controversy exceeds $75,000, exclusive of costs and interest.  According to Plaintiff herself, a reasonable estimate of her claims is $300,000, an amount well over the $75,000 threshold for diversity claims.  Prior to filing her lawsuit, Plaintiff sent correspondents to Defendants' counsel offering to accept payment of $300,000 to settle her employment claims

DEFENDANTS' NOTICE OF REMOVAL TO FEDERAL COURT
CASE NO.

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

1    against Defendants.  (Glazer Decl. ¶ 5, Ex. E.)  "A settlement demand is relevant

2    evidence of the amount in controversy if it appears to reflect a reasonable estimate

3    of the plaintiff's claims."  *Cohn v. Petsmart*, 281 F.3d 837, 840 (9th Cir. 2002); *see*

4    *also Babasa v. Lenscrafters, Inc.*, 498 F.3d 972, 975 (9th Cir. 2007).

5       Also, in her Complaint, Plaintiff seeks past and future economic and non-

6    economic damages, emotional distress damages, punitive damages, and attorneys'

7    fees.  (Glazer Decl. ¶ 2, Ex. A ¶¶ 41, 42, 47, 48, 52, 53, 55, 56, 57, 58, 63, 69,

8    Prayer for Relief.)  All of Plaintiff's purported damages may be used to determine

9    the amount in controversy.  *See* 28 U.S.C. § 1332(a).  Where it is "unclear or

10    ambiguous from the face of a state-court complaint whether the requisite amount in

11    controversy is pled," the Court must determine whether it is "more likely than not"

12    that the amount in controversy exceeds $75,000.  *Guglielmino v. McKee Foods*

13    *Corporation*, 506 F.3d 696, 699-701 (9th Cir. 2007).  The Court must consider any

14    "sum which would entail a payment" by the defendant, including damages for lost

15    wages, lost future wages, the value of lost health benefits, compensatory damages,

16    punitive damages, and attorney's fees.  *Id.* at 698-701 (affirming district court's

17    calculation of amount in controversy, including back benefits, estimated attorneys'

18    fees of 12.5% of actual damages sought and punitive damages at a 1:1 ratio to

19    economic damages).

20       Accordingly, per Plaintiff's own pre-litigation damage assessment of

21    $300,000, in accordance with the relief sought in her Complaint, places the amount

22    in controversy over $75,000.

23    **IV.**     **THE NOTICE OF REMOVAL IS TIMELY**

24       Removal of a complaint from state court to federal court must be effected

25    within 30 days from the first date from that it can be ascertained that that federal

26    subject matter jurisdiction exists.  *See, e.g.*, 28 U.S.C. 1446(b).  That statute

27    provides in relevant part:

28

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

4

1   "The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based . . . ."

2

3

4   Here, Plaintiff served the Summons and Complaint to the ZOA on March

5   27, 2013 and Mr. Klein on April 20, 2013.  (Glazer Decl. ¶ , Exh. A.)  As a result,

6   Defendants filed this Notice of Removal less than thirty (30) days of service of the

7   Complaint's service.  Thus, removal is timely pursuant to 28 U.S.C. section

8   1446(b).

9   **IV.    CONCLUSION**

10   For the foregoing reasons, removal of this case to federal court is proper.

11   This Court has original jurisdiction over this matter pursuant to 28 U.S.C. sections

12   1332(a) and 1441.

13

14   Dated:       April 25, 2013              HIRSCHFELD KRAEMER LLP

15

16                                           By:

17                                               Gregory S. Glazer
                                                 Alison M. Hamer
18                                           Attorneys for Defendants
                                             ZIONIST ORGANIZATION OF AMERICA
19                                           and MORTON KLEIN

20

21

22

23

24

25

26

27

28

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

5

DEFENDANTS' NOTICE OF REMOVAL TO FEDERAL COURT
CASE NO.

# CERTIFICATE OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am a citizen of the United States and a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 233 Wilshire Boulevard, Suite 600, Santa Monica, California 90401. On April 25, 2013, I served the following document(s) by the method indicated below:

**DEFENDANT ZIONIST ORGANIZATION OF AMERICA AND MORTON KLEIN'S NOTICE OF REMOVAL TO FEDERAL COURT UNDER 28 U.S.C. § 1441(a); 28 U.S.C. § 1332**

☐    by transmitting **via facsimile** on this date from fax number (310) 255-0986 the document(s) listed above to the fax number(s) set forth below. The transmission was completed before 5:00 p.m. and was reported complete and without error. Service by fax was made by agreement of the parties, confirmed in writing. The transmitting fax machine complies with Cal. R.Ct 2003(3).

☒    by placing the document(s) listed above in a sealed envelope(s) with postage thereon fully prepaid, in the **United States mail** at Santa Monica, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited in the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐    by placing the document(s) listed above in a sealed envelope(s) and by causing **messenger delivery** of the envelope(s) to the person(s) at the address(es) set forth below. I am readily familiar with the business practice of my place of employment with respect to the collection and processing of correspondence, pleadings and notices for hand delivery. On April 25, 2013, I caused to be served via messenger the above-listed documents.

☐    by **personally delivering** the document(s) listed above to the person(s) at the address(es) set forth below.

☐    by placing the document(s) listed above in a sealed envelope(s) and consigning it to an **express mail service** for guaranteed delivery on the next business day following the date of consignment to the address(es) set forth below.

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

1   Bryan C. Altman
2   Joel E. Elkins
    The Altman Law Group
3   6300 Wilshire Blvd., Ste. 980
4   Los Angeles, CA  90048
    Phone: (323) 653-5581
5   Fax: (323) 653-5542

6       I declare under penalty of perjury under the laws of the United States that the
    foregoing is true and correct, and that I am employed by an officer of a member of
7   the bar of this Court at whose direction the service was made.  Executed on
    April 25, 2013 at Santa Monica, California.

8                                                      _Karen Torres_____
9                                                           Karen Torres

10

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I, the undersigned, am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 233 Wilshire Boulevard, Suite 600, Santa Monica, California  90401.  On April 25, 2013, I served the following document(s) by the method indicated below:

**DEFENDANTS ZIONIST ORGANIZATION OF AMERICA AND MORTION KLEIN'S NOTICE TO STATE COURT AND TO ADVERSE PARTIES RE: REMOVAL TO U.S. DISTRICT COURT, CENTRAL DISTRICT**

☐   by transmitting **via facsimile** on this date from fax number (310) 255-0986 the document(s) listed above to the fax number(s) set forth below.  The transmission was completed before 5:00 p.m. and was reported complete and without error.  Service by fax was made by agreement of the parties, confirmed in writing.  The transmitting fax machine complies with Cal. R.Ct 2003(3).

☒   by placing the document(s) listed above in a sealed envelope(s) with postage thereon fully prepaid, in the **United States mail** at Santa Monica, California addressed as set forth below.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited in the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐   by placing the document(s) listed above in a sealed envelope(s) and by causing **messenger delivery** of the envelope(s) to the person(s) at the address(es) set forth below.  I am readily familiar with the business practice of my place of employment with respect to the collection and processing of correspondence, pleadings and notices for hand delivery.  On April 25, 2013, I caused to be served via messenger the above-listed documents.

☐   by **personally delivering** the document(s) listed above to the person(s) at the address(es) set forth below.

☐   by placing the document(s) listed above in a sealed envelope(s) and consigning it to an **express mail service** for guaranteed delivery on the next business day following the date of consignment to the address(es) set forth below.

Bryan C. Altman
Joel E. Elkins
The Altman Law Group
6300 Wilshire Blvd., Suite 980
Los Angeles, CA  90048
Phone: (323) 653-5581
Fax: (323) 653-5542

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  Executed on April 25, 2013, at Santa Monica, California.

_Karen Torres_
Karen Torres

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

EXHIBIT E

# THE ALTMAN LAW GROUP
### ATTORNEYS AT LAW

6300 WILSHIRE BOULEVARD, SUITE 980
LOS ANGELES, CALIFORNIA 90048
TELEPHONE (323) 653-5581
FACSIMILE (323) 653-5542



March 15, 2013

**Via Fedex, Email (gglazer@hkemploymentlaw.com) and Fax (310-255-0986)**
Gregory S. Glazer, Esq.
Hirschfeld Kraemer LLP
233 Wilshire Boulevard, Suite 600
Santa Monica, CA 90401

Re:     Orit Arfa - FEHA Claim

Dear Mr. Glazer:

We represent Orit Arfa regarding all claims arising from tortious acts perpetrated against Ms. Arfa by your client, the Zionist Organization of America ("ZOA"). Based on our own comprehensive investigation and review of the work performed by our client, the correspondence history and other facts, we have determined that ZOA discriminated against and wrongfully terminated Ms. Arfa for speaking up against ZOA's policy of withholding from donors the loss of its tax exempt status.

Our investigation so far has revealed that on several occasions, Ms. Arfa expressed to ZOA President Morton Klein and other members of the ZOA Board that, in her opinion, withholding the facts that ZOA had lost its tax exempt status and that donations made to the Foundation for the Jewish Community (FJC) were not in fact donations to ZOA was at best unethical and at worst illegal. Indeed, an opinion letter prepared by outside legal counsel later confirmed our client's suspicion that the practice was not only unethical but illegal. (See Seton memo listed as Exhibit B to the draft complaint attached hereto). Despite her strongly voiced and strong objection, Ms. Arfa was continually pressed to continue her fund-raising efforts as dictated by Mr. Klein and ZOA and not to say anything publicly because it would tarnish ZOA's reputation and negatively impact fund-raising. She was increasingly harassed by Mr. Klein with threatening and abusive telephone calls to her cell phone at all hours of day and night, causing her anxiety, sleeplessness and emotional distress. Her conscience and affinity for the principles for which ZOA supposedly stands caused her great concern, and she expressed that concern in a series of memos to the ZOA leadership. Instead of being commended for her principles and desire to protect donors from misrepresentation and the organization from potential liability, she was fired.

Gregory S. Glazer, Esq.
March 15, 2013
Page 2

There is no dispute that Ms. Arfa was doing an amazing job in her position as West Coast director, as confirmed by expressions of praise from her constituency, the Board and upper management.  In the short time that she was at ZOA, Ms. Arfa brought more energy, creativity, passion and organizational and managerial skills than all her predecessors had brought to the job. The directors of other regions (who happened to be male, and who went along with the coverup of the tax-exemption issue during their fund-raising, if they were asked to fund-raise at all) maintained their positions despite job performances that could not match that of Ms. Arfa.  The only plausible explanations for her firing is that management wanted to silence her conscientious objections to an unethical and illegal policy, or (hard to believe in this day and age) because she is a strong, outspoken woman.

Once FEHA grants her the right to sue, Ms. Arfa intends to assert claims for, *inter alia*, wrongful termination, gender discrimination and intentional infliction of emotional distress. Following the prosecution of her FEHA claims, Ms. Arfa will pursue next her complaint through the court system.  For your reference, we have attached as well a draft of the claim we will send to the California Department of Fair Employment and Housing.

Based on our review of the enormous amount of documentary evidence showing a clear correlation between Ms. Arfa's resistance to promoting illegal activity in which she was instructed to participate and her termination, as well as the callousness with which she was treated, we believe Ms. Arfa has a strong claim for substantial damages.

Our client desires to amicably resolve her dispute with ZOA.  Our client is willing at this time to agree to a one-time payment of three hundred thousand dollars ($300,000.00) to resolve this dispute.  This is a pre-litigation offer.  It will remain open until 5:00 p.m. PST on March 19, 2013.  In the event it becomes necessary to file a lawsuit, any such lawsuit will include, as stated above, claims for wrongful termination, gender discrimination and intentional and negligent infliction of emotional distress, and unlawful and fraudulent business practices, several of which could also trigger a right to an award of exemplary or punitive damages in addition to the customary compensatory damages in unlawful termination actions.  We may also ask the New York Attorney General's Office and the IRS for their help investigating the ZOA's conduct in this matter.  In the event of a lawsuit, your client may be liable for attorney's fees, as well as other costs.

This communication is part of a confidential settlement discussion. For that reason, all of the information contained within this letter is provided for settlement purposes only pursuant to California Evidence Code Section 1152.

Gregory S. Glazer, Esq.
March 15, 2013
Page 3

     Nothing in this letter constitutes a complete statement of our clients' rights, contentions, or claims.  Additionally, nothing stated herein is intended as, nor should it be deemed to constitute, a waiver of any of my client's rights or remedies, whether legal or equitable, all of which are expressly reserved.

        Very truly yours,

        Bryan C. Altman
        The Altman Law Group

BCA/ir

**CERTIFICATE OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

    I am a citizen of the United States and a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 233 Wilshire Boulevard, Suite 600, Santa Monica, California 90401. On April 25, 2013, I served the following document(s) by the method indicated below:

**DECLARATION OF ALISON M. HAMER IN
SUPPORT OF NOTICE OF REMOVAL TO
FEDERAL COURT UNDER 28 U.S.C. § 1441 (A); 28
U.S.C. § 1332**

☐   by transmitting **via facsimile** on this date from fax number (310) 255-0986 the document(s) listed above to the fax number(s) set forth below. The transmission was completed before 5:00 p.m. and was reported complete and without error. Service by fax was made by agreement of the parties, confirmed in writing. The transmitting fax machine complies with Cal. R.Ct 2003(3).

☒   by placing the document(s) listed above in a sealed envelope(s) with postage thereon fully prepaid, in the **United States mail** at Santa Monica, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited in the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐   by placing the document(s) listed above in a sealed envelope(s) and by causing **messenger delivery** of the envelope(s) to the person(s) at the address(es) set forth below. I am readily familiar with the business practice of my place of employment with respect to the collection and processing of correspondence, pleadings and notices for hand delivery. On April 25, 2013, I caused to be served via messenger the above-listed documents.

☐   by **personally delivering** the document(s) listed above to the person(s) at the address(es) set forth below.

☐   by placing the document(s) listed above in a sealed envelope(s) and consigning it to an **express mail service** for guaranteed delivery on the next business day following the date of consignment to the address(es) set forth below.

DECLARATION OF G. GLAZER ISO REMOVAL TO FEDERAL COURT
CASE NO.

1
2
3
4
5

Bryan C. Altman
Joel E. Elkins
The Altman Law Group
6300 Wilshire Blvd., Ste. 980
Los Angeles, CA  90048
Phone: (323) 653-5581
Fax: (323) 653-5542

6
7

   I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I am employed by an officer of a member of the bar of this Court at whose direction the service was made.  Executed on April 25, 2013 at Santa Monica, California.

8
9

_Karen Torres_

Karen Torres

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HIRSCHFELD KRAEMER LLP
ATTORNEYS AT LAW
SANTA MONICA

4